UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MARK JOHNSON,                                           :

                 Petitioner,                        :

        -against-                                    :

DALE ARTUS, Superintendent,                            :
Clinton Correctional Facility,
                                                        :
                 Respondent.
                                                        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

09 Civ. 9483 (PAC) (AJP)

**REPORT AND RECOMMENDATION**

**ANDREW J. PECK, United States Magistrate Judge:**

**To the Honorable Paul A. Crotty, United States District Judge:**

            Pro se petitioner Mark Johnson seeks a writ of habeas corpus from his August 10, 2004 conviction of second and third degree criminal possession of a weapon and concurrent sentences, the maximum being thirteen years imprisonment.  (Dkt. No. 5: Am. Pet. ¶¶ 1-5.)

            Johnson's habeas petition asserts that the trial court:  (1) violated his "right to a fair trial and to present a defense" by improperly excluding third-party allegations of police brutality (Am. Pet. ¶ 13(1)); (2) improperly modified its in limine ruling to "allow the prosecution to extensively question [Johnson] about uncharged drug crimes" (Am. Pet. ¶ 13(2)); and (3) in sentencing Johnson, improperly relied upon the prosecution's pre-sentence memorandum that included "unreliable hearsay allegations from anonymous informants concerning [Johnson's] criminal history" (Am. Pet. ¶ 13(3)).

H:\OPIN\JOHNSON-Mark

For the reasons set forth below, Johnson's habeas petition should be <u>DENIED</u>.

## FACTS

On August 12, 2003 at approximately 8:30 p.m., Mark Johnson was arrested on the third floor of an apartment building, located at 118 Avenue D in Manhattan, for possessing a loaded nine-millimeter pistol.  (Dkt. No. 11: State Br. at 2; Dkt. No. 12: Tarr Aff. Ex B: Johnson 1st Dep't Br. at 3-4.)[1/]  Johnson was indicted on August 19, 2003 for third degree criminal possession of a weapon (possessing a loaded gun).  (State Br. at 2; Johnson 1st Dep't Br. at 6.)

**Johnson's Suppression Motion**

On December 4, 2003, Johnson moved to suppress the pistol recovered during his August 12, 2003 arrest on the grounds that the police lacked probable cause to search him.  (Dkt. No. 11: State Br. at 3; Dkt. No. 12: Ex. B: Johnson 1st Dep't Br. at 6-7.)  Johnson's motion went unopposed and, on January 5, 2004, Justice Renee A. White ordered a <u>Mapp/Dunaway</u> hearing. (State Br. at 3; Johnson 1st Dep't Br. at 6-7.)

On May 11, 2004, the State filed a superseding indictment charging Johnson with second degree criminal possession of a weapon (possessing a loaded firearm with the intent to use it unlawfully) and an additional count of third degree criminal possession of a weapon (possessing a gun with defaced serial numbers).  (State Br. at 3; Johnson 1st Dep't Brief at 7.)  On August 2, 2004, the State moved for reconsideration of the order granting a <u>Mapp/Dunaway</u> hearing on the

_____

[1/]     All references to exhibits, unless otherwise noted, are to the May 14, 2010 Affidavit of Assistant Attorney General Paul M. Tarr in opposition to the petition.  (Dkt. No. 12.)

H:\OPIN\JOHNSON-Mark

ground that Johnson lacked standing to contest the search because he testified before the grand jury that he never possessed a gun.  (State Br. at 3; Johnson 1st Dep't Br. at 7-8.)  On August 3, 2004, Justice Charles Solomon rescinded the order granting a <u>Mapp/Dunaway</u> hearing, reasoning that Johnson "doesn't have standing to contest the search because he claim[ed] under oath [before the grand jury] that he never possessed the weapon in question."  (Dkt. No. 13: 8/3/04 Hearing Tr. 5-6.)

**<u>The Trial</u>**

On August 3, 2004, Johnson proceeded to trial before Justice Phillip M. Grella and a jury in Supreme Court, New York County.  (Dkt. No. 13: Trial Transcript ["Tr."] 1.)

**<u>Motions In Limine</u>**

Prior to jury selection, the prosecutor requested that if Johnson testified at trial "that he didn't have a gun," the prosecutor be permitted to inquire whether Johnson "was involved in drug dealing[,] did he have a dispute with Andre Horton, [and] was he using a weapon that day so that he could maintain his drug business in the building."  (Dkt. No. 13: Tr. 12.)  The prosecutor asserted that he had a good faith basis for these questions and offered to present "statements by witnesses who will not testify, [and the State] choose[s] not to identify."  (Tr. 12.)  Justice Grella ruled that questions of uncharged criminal activities "[c]ould not come in on the People's case," but that Johnson's testimony could "open a door that normally would have been closed."  (Tr. 12-13.)

At the same time, defense counsel requested that Justice Grella preclude evidence that Johnson possessed drugs at the time of his arrest.  (Tr. 13.)  Justice Grella agreed that evidence of

Johnson's uncharged drug possession was inadmissible in the prosecution's direct case, but ruled that the prosecution could move for reconsideration after Johnson testified.  (Tr. 13-14.)[2/]

Finally, the prosecutor asked Justice Grella to preclude evidence of an excessive force complaint filed against the police by Andre Horton, who was arrested for "disorderly conduct" outside of 118 Avenue D shortly before other officers arrested Johnson on the third floor.  (Tr. 235.) Horton alleged that an officer had hit him in the head with a walkie talkie, but did not implicate any of the officers involved in Johnson's arrest.  (Tr. 235.)  Internal Affairs initiated an investigation and took statements from Johnson and Lieutenant Gerald Cawley, the supervising officer at the scene. (Tr. 235-36.)  Horton pled guilty to the disorderly conduct charge and refused to cooperate further with the Internal Affairs investigation.  (Tr. 235.)  The prosecutor requested preclusion of the Internal Affairs interviews with Johnson and Lt. Cawley because they might "leave the jury with the impression Lieutenant Cawley was . . . a witness to" Horton's assault.  (Tr. 236.)

Johnson's counsel argued that Horton's complaint was "intrarelated and integral" to presenting an effective defense.  (Tr. 236-37.)  According to defense counsel, the prosecution's theory of the case was that "Johnson was in a dispute with [Horton] outside the building" and had struck Horton with the gun, demonstrating his intent to use it unlawfully.  (Tr. 237.)  Defense

---

[2/]    Justice Grella also heard Johnson's <u>Sandoval</u> application.  (<u>See</u> Tr. 21-31.)  Justice Grella ruled that the prosecution could ask Johnson whether or not he had been convicted of third degree attempted sale of controlled substance on November 30, 1993, and "if [Johnson] denies it, [the prosecutor] can cross-examine him with regard to a certificate of disposition and if [Johnson] still denies it then [the prosecutor] can go into the underlying facts and circumstances."  (Tr. 29.)  This ruling was not contested on appeal or in Johnson's present habeas petition.

counsel sought to prove, however, that Johnson's "wrongful false perjurous arrest was based in part on an effort to cover the officer's illegal or at least excessive actions . . . . [w]ith respect to their other arrestees" by framing Johnson.  (Tr. 381.)  Justice Grella speculated that defense counsel just "want[ed] to introduce collateral evidence with regard to police conduct," and ruled that neither party could bring up Horton's injury or Horton's excessive force complaint because it was not relevant to Johnson's gun possession charge.  (Tr. 238-40, 382-84.)

### The Prosecution Case at Trial

On August 3, 2003 at approximately 8:30 p.m., police officers from the Ninth Precinct received a radio transmission reporting a "dispute with firearms" outside the Jacob Riis Houses at 118 Avenue D in Manhattan.  (Dkt. No. 13: Cawley: Tr. 266-67, 319; Gordon: Tr. 327; Delmar: Tr. 346-47.)  Lt. Gerald Cawley and Officer Christopher Delmar responded on foot from the nearby precinct.  (Cawley: Tr. 267; Delmar: Tr. 346-47.)  By the time they arrived, housing police officers and other Ninth Precinct officers, including Officer Shawn Gordon and his partner Officer Blair, were already present.  (Cawley: Tr. 269, 290, 292-93; Gordon: Tr. 328, 336.)[3]  A crowd had gathered in front of the building and civilians were "rushing [both] out of the lobby and up the stairs" in the building.  (Cawley: Tr. 268-69, 290, 292-93, 315-16; Gordon: Tr. 328, 336.)  Andre Horton was detained by Officer Blair and other officers in front of the building.  (Cawley: Tr. 291, 316-17, 323; Gordon: Tr. 336-37.)

---

[3]  On cross-examination, defense counsel established that Officer Gordon has a "friend[] in common with Mr. Johnson," named Leana Perillo.  (Gordon: Tr. 334.)

Lt. Cawley instructed Officer Delmar to remain with Officer Blair while he and Officer Gordon made a vertical sweep of the building. (Cawley: Tr. 269-70, 293; Gordon: Tr. 329; Delmar: Tr. 348.) As Lt. Cawley and Officer Gordon approached the third floor landing, they heard a man yelling and a "banging sound" in the hallway. (Cawley: Tr. 270-71, 295-96, 321; Gordon: Tr. 329-30.) Lt. Cawley exited the stairwell and observed Johnson, "sweating profusely," "banging frantically on the door" to Apartment 3G, "yelling and screaming, 'let me in.'" (Cawley: Tr. 271-73, 295-97.)[4/]

Lt. Cawley pointed his gun at Johnson and yelled "[P]olice, don't move." (Cawley: Tr. 273, 303; Gordon: Tr. 330.) Johnson "stopped banging" on the door, made "a slight turn away from" Lt. Cawley and "reached his right hand towards his waistband area." (Cawley: Tr. 273-74, 303-04; Gordon: Tr. 338.) Lt. Cawley knew from personal experience that carrying a handgun in one's waistband requires "constant[] checking and adjusting it making sure it's not falling" (Cawley: Tr. 288), and interpreted Johnson's motion as an indication that he might have a gun (Cawley: Tr. 320). Lt. Cawley thought Johnson could be one of the armed men involved in the dispute, and again told Johnson not to move. (Cawley: Tr. 274, 320.) As Lt. Cawley and Officer Gordon approached with their weapons drawn, Lt. Cawley instructed Johnson to put his hands on the wall. (Cawley: Tr. 274-75; Gordon: Tr. 330.) When Johnson complied, Lt. Cawley patted the front of Johnson's

---

[4/] Officer Gordon was able to hear Johnson yelling from the stairwell but could not recall what Johnson was saying. (Gordon: Tr. 329.) Officer Gordon did not see Johnson knocking on any door, but saw him facing Apartment 3G. (Gordon: Tr. 335, 340-41.)

waistband area.  (Cawley: Tr. 275; Gordon: Tr. 330-31.)  Lt. Cawley felt a hard object in Johnson's

waistband and removed a loaded pistol.  (Cawley: Tr. 276; Gordon: Tr. 331.)

        Lt. Cawley put the pistol in his own rear waistband and he and Officer Gordon placed

Johnson on the floor and handcuffed him.  (Cawley: Tr. 276, 305; Gordon: Tr. 331.)[5]  Immediately

after handcuffing Johnson, Lt. Cawley unloaded Johnson's gun, removing the magazine and one

bullet from the chamber.  (Cawley: Tr. 277-79.)  Both officers noted that the serial number on the

gun had been scratched off.  (Cawley: Tr. 323; Delmar: Tr. 353.)  The officers lifted Johnson to his

feet and walked him out of sight of apartment 3G.  (Cawley: Tr. 297, 305-06; Gordon: Tr. 331.)

        Lt. Cawley and other officers entered apartment 3G to perform a quick search for

"victims, anybody shot or anything like that."  (Cawley: Tr. 297-98; Gordon: Tr. 322, 332.)[6]  The

police determined there were no "victims," but housing police officers discovered at least one firearm

and arrested James Williams, a resident of apartment 3G, for criminal possession of a weapon.

(Cawley: Tr. 299-300, 305; Gordon: Tr. 334-35.)

        Lt. Cawley called Officer Delmar to the third floor to "voucher" the gun.  (Cawley:

Tr. 280, 284, 306; Delmar: Tr. 349, 350, 357.)  Officer Delmar was designated as the "arresting

officer" and he prepared the paperwork incident to Johnson's arrest.  (Cawley: Tr. 280, 301, 306;

---

[5]     Although Officer Gordon agreed that Lt. Cawley removed the gun from Johnson's waistband, he recalled that Lt. Cawley dragged Johnson to the ground before removing the gun. (Gordon: Tr. 331, 335.)

[6]     Lt. Cawley estimated that he was on the third floor for approximately thirty minutes. (Cawley: Tr. 300.) Officer Gordon, however, recalled spending "[m]aybe five, ten minutes" there.  (Gordon: Tr. 331.)

Delmar: Tr. 355-56.)  After inspecting the gun and verifying that it was unloaded, Officer Delmar placed his mark on each piece of the weapon (handgun, magazine and  bullets) and "vouchered" them in a sealed and signed security envelope with a unique number.  (Delmar: Tr. 350-52.)  At trial, Officer Delmar verified that the gun (People's Exhibit 2) was the one he vouchered the night of August 12, 2003.  (Delmar: Tr. 351-55.)

Officer Delmar sent the handgun and the eight rounds of ammunition removed from the gun to the NYPD Firearms Analysis Section for testing.  (Delmar: Tr. 355; Stokes: Tr. 364.) Detective Desmond Stokes test fired the gun and confirmed that both the gun and the ammunition were operable.  (Stokes: Tr. 367-68.)  Detective Stokes also determined that the gun's serial number had been scraped off.  (Stokes: Tr. 370.)[2]

---

[2]     Because Officer Delmar had not requested fingerprint tests on the gun or ammunition, none were performed.  (Delmar: Tr. 356-57; Stokes: Tr. 372-73.)  Detective Stokes testified, however, that weapons are "generally not conducive to fingerprints" (Stokes: Tr. 372) and that the conditions in which a weapon is handled, such as how many people touch it and how it is placed, affect the decision on whether or not to test for fingerprints (Stokes: Tr. 374-75).

**The Defense Case at Trial**[8]

Johnson testified in his own defense at trial.  (Dkt. No. 13: Johnson: Tr. 385-439.)

Johnson was raised in the Jacob Riis Houses and had family members who lived there for "forty to

fifty" years.  (Johnson: Tr. 392.)  Although Johnson no longer lived at 118 Avenue D, he retained

a key to the building's front door (Johnson: Tr. 430) and  knew many people who lived there.

(Johnson: Tr. 392-96.)

Johnson was "[v]ery good friends," like brother and sister, with Leana Perillo in

apartment 2A and visited her "practically everyday."  (Johnson: Tr. 393.)  If Perillo was not home

when Johnson stopped by, he would check with the Echavaria family in apartment 3H to see if

Perillo was there.  (Johnson: Tr. 395.)  At the time of Johnson's arrest, Perillo was dating Officer

Gordon, whom Johnson had met several times at Perillo's apartment.  (Johnson: Tr. 394.)  Johnson

had no problems with Officer Gordon.  (Johnson: Tr. 434.)  Johnson also knew James Williams and

Carada Marrero, the occupants of apartment 3G, but only from "seeing them in the neighborhood";

Johnson didn't "hang with them[,] just hi and bye, that's it."  (Johnson: Tr. 396.)

At around 8:15 p.m. on August 12, 2003, Johnson went to visit Perillo.  (Johnson:

Tr. 396.)  When he arrived at 118 Avenue D, Johnson noticed an "unusual crowd" of people in front

---

[8]     At the end of the prosecution's case, defense counsel moved to dismiss the indictment on the
grounds that the prosecution had failed to make a prima facie case.  (Tr. 376.)  Justice Grella
ruled that the prosecution had made a prima facie case on all counts and denied the motion.
(Tr. 376-77.)  Defense counsel also renewed his application to introduce evidence of Horton's
excessive force complaint, but Justice Grella did not alter his in limine ruling precluding that
evidence.  (Tr. 379-84.)

of the building, but did not see any police officers.  (Johnson: Tr. 400.)  Johnson took the elevator

to the second floor but Perillo was not at home so he took the staircase up one floor to see if she was

visiting the Echavarias in apartment 3H.  (Johnson: Tr. 401.)

      As Johnson was about to knock on the Echavarias' door, Lt. Cawley and Officer

Gordon "appeared with the[ir] guns out."  (Johnson: Tr. 401, 421.)  Johnson asked Lt. Cawley, "[I]s

there a problem?  What's the problem?" but Lt. Cawley told him "[F]reeze, don't move" and pointed

his gun at Johnson's head.  (Johnson: Tr. 401, 420-21.)[9/]  Johnson complied with the officers, who

patted him down, "threw [him] on the floor," handcuffed him and "dragged [him] by [his] cuffs

around the corner in the hallway."  (Johnson: Tr. 401, 428-29.)  While handcuffed and on the floor,

Johnson heard the police enter an apartment and confront the individuals inside.  (Johnson: Tr. 401-

02.)

      After being taken to the Ninth Precinct, Johnson learned he was being charged with

criminal possession of a weapon.  (Johnson: Tr. 403.)  Johnson also found out that James Williams

had been arrested for "[g]un possession."  (Johnson: Tr. 402.)

      Johnson testified that he never owned a gun and denied having one on August 12,

2003.  (Johnson: Tr. 402-03.)[10/]

---

[9/]    Johnson though that Officer Gordon pointed his gun at Johnson's back, but he was not "too
sure."  (Johnson: Tr. 422.)  The prosecution cross-examined Johnson with his May 2004
grand jury statement that "one [officer] puts the gun on the back of my head, the other puts
one -- puts it at my chest."  (Johnson: Tr. 422-23.)

[10/]    Defense counsel asked Johnson if he was questioned or made any statements at the precinct,
                          (continued...)

### The Prosecutor's Cross-Examination of Johnson and Modification of the In Limine Ruling

After Johnson's direct testimony, the prosecutor moved for reconsideration of the in limine ruling barring inquiry into Johnson's uncharged drug-dealing activities. (Dkt. No. 13: Tr. 408-09.)  The prosecutor provided Justice Grella with three confidential statements from non-testifying witnesses in order to demonstrate a good faith basis for inquiring into Johnson's drug-related activities on, and prior to, August 12, 2003.  (Tr. 410-12.)  According to the prosecutor, the confidential statements established that Johnson was "involved in narcotics dealing in those projects" and that "James Williams is an individual who [Johnson had] tried to recruit for narcotics dealing . . . . [and] knows . . . very well." (Tr. 408-09.)  Based on these statements, the prosecutor theorized that Johnson "went to [Williams'] apartment to hide the gun because he knew the police were coming and[,] if not[,] to hide from whatever commotion was downstairs [, i.e.,] the dispute he was having with Mr. Horton." (Tr. 409-10.)  When Justice Grella asked what portion of Johnson's testimony the prosecutor relied on as opening the door to admission of this evidence, the prosecutor responded:

> The defendant said he had no gun. . . . he's basically saying ["]I'm going up to visit my friend[,"] and the truth of the matters is[,] based on a good faith basis I have from the interviews I have, is that the defendant was really running up the stairs.  What it goes to is motive, that the defendant -- in fact, had a motive to have the gun, that in order to protect his narcotics business and that he also had a motive for being on the

10/      (...continued)
but Justice Grella sustained the prosecutor's objections based on the in limine ruling that Horton's excessive force allegations and the Internal Affairs interviews were off-limits. (Johnson: Tr. 403.)

> third floor and possessing a weapon there because he was trying to get away from a place where the police might find it and that was by gaining entrance into the apartment.

(Tr. 410-11.)  The prosecutor conceded that if allowed to pursue the line of questioning, he could not "introduce extraneous testimony or evidence in order to disprove" Johnson's answers.  (Tr. 411.)

Justice Grella reviewed the statements in camera and found that they

> establish[ed] a good faith basis to believe[,] if this were believed[,] that [Johnson] was in the area of apartment 3G to possess, to dispose of and to conceal a firearm[,] and that it had something to do with the trafficking of cocaine[,] and that his relationship to one of the people that he testified is not the relationship that he testified to but a relationship that has to do with the trafficking of Crack[.]

(Tr. 416.)  Justice Grella ruled that the prosecutor could "cross-examine appropriately with regard to the facts and circumstances surrounding the defendant's presence on the second and third floor at [or] about and immediately prior to" his arrest.  (Tr. 412-13.)

Defense counsel objected to Justice Grella's ruling, arguing that the case was a "trial of straight credibility of witnesses" and to question Johnson about the uncharged drug activities "would be unduly prejudicial and unfair."  (Tr. 414.)  Defense counsel complained of being "sandbagged" and that had he "been given some [inkling] as to the existence of these witnesses and their statements [he] may very well have proceeded differently."  (Tr. 413.)  Justice Grella allowed the prosecutor to proceed, noting that "the People are right, it has to do with credibility and in essence [the prosecution] would be stuck with the answers that the defense were to give."  (Tr. 415.)

The prosecutor cross-examined Johnson regarding uncharged drug activities, as follows:

> Q      And, so you don't know Mr. Williams because he used to be a drug user and
>        would buy drugs from you?
>
> A      (No response)
>
> [Defense Counsel]:  Objection.
>
> THE COURT:  Overruled.
>
> Q      Can you answer the question?
>
> A      Repeat that question.
>
> Q      Isn't it true that you know Mr. Williams [the resident of Apartment 3G]
>        because he's a former crack addict and he would buy Crack from you?
>
> A      No.
>
> Q      Isn't it true that you don't simply know Mr. Williams because you know Miss
>        Marrero [the other resident of Apartment 3G] but you actually asked him to
>        assist you in selling Crack, using Apartment 3G?
>
> [Defense Counsel]:  Objection.
>
> THE COURT:  Overruled.
>
> A      No.

(Johnson: Tr. 426-27.)

In response to the defense eliciting on redirect that Johnson was "[t]horoughly"

searched while on the third floor (Johnson: Tr.: 435-36), the prosecutor on re-cross-examination

asked:

> Q      And isn't it true Mr. Johnson that in fact when you were brought back to the
>        precinct during that time you removed a bag that was hidden in your – on
>        your person with 43 bags of crack and that you left it inside the radio motor
>        patrol car in an attempt to hide it when you were removed from the car?

[Defense Counsel]:  Objection.

THE COURT:  Overruled.

A       No.

Q       No?

A       (Shakes head.)

Q       So it's not true that you tried to put that item in the backseat and in fact ripped
        it slightly in an attempt to hide it or hide the items that were in that bag
        before you were taken out of the car where you would be searched thoroughly
        back at the precinct?

[Defense Counsel]:  Objection.

THE COURT:  Overruled.

A       No.

(Johnson: Tr. 436-37.)

Although Johnson denied the criminal activities alleged by the prosecutor, Johnson

acknowledged his December 12, 1993 drug conviction, as per the <u>Sandoval</u> ruling.  (Tr. 424; <u>see</u>

page 4 n.2 above.)

### Summations

In summation, defense counsel argued that the reason "for doubting the People's proof

mainly has to do with the credibility of the police officers who testified."  (Dkt. No. 13: Tr. 467.)

Defense counsel argued that "the gun in People's Exhibit 2 came from apartment 3G."  (Tr. 471.)

Defense counsel argued that, as the supervisor, Lt. Cawley "knows how to justify his actions after

the fact and . . . he can direct others to go along with him, too."  (Tr. 470.)  With regard to Officer

Gordon, defense counsel implied that his relationship with Leana Perillo provided motive to frame Johnson: "Shawn Gordon is jealous of Mark Johnson, he doesn't like to find Mark in Leana's place when he goes to visit her.  He would just [as soon] have him out of the way[;] . . . jealousy is a powerful bias, something you certainly can consider in evaluating the credibility" of Officer Gordon's testimony, along with the fact that Officer Gordon "has to get along with his boss, Lt. Cawley."  (Tr. 475.)  Defense counsel noted that if, as the police testified, Johnson was trying to get rid of the gun, he could have thrown it down the incinerator chute on the second or third floor.  (Tr. 479.)  Finally, defense counsel pointed out the dearth of evidence linking Johnson to the gun, including fingerprints or civilian testimony, and opaquely referred to the "blue wall" of silence.  (Tr. 476-77.)

The prosecutor's summation also focused on the credibility of the police witnesses. (See Tr. 483-85, 499-500, 505, 521, 525-26.)  To the prosecutor, the ability of the police officers to "confront that gunman in the hallway, disarm him without using violence and render what was potentially a very dangerous situation peacefully speaks volumes about the credibility of these police officers."  (Tr. 483-84.)  The prosecutor also highlighted the speculative nature of the defense, pointing out that Johnson did not produce any witnesses, such as Perillo, to bolster his defense.  (Tr. 509-14, 516-17.)  The prosecutor reiterated to the jurors that "[i]f you are going to question the [police officers'] credibility [and] say there is a reasonable doubt[,] it must be something from the evidence not based on police bias, prejudice."  (Tr. 526.)

**Verdict and Sentence**

On August 10, 2004, the jury convicted Johnson of second degree criminal possession of a weapon and two counts of third degree criminal possession of a weapon. (Dkt. No. 13: Tr. 563-66.)

On September 9, 2004, Justice Grella sentenced Johnson as a predicate felon to concurrent prison terms, the longest being thirteen years imprisonment. (Dkt. No. 13: 9/9/04 Sentencing Tr. ["S."] at 3-5, 32-33.)   In determining Johnson's sentence, Justice Grella heard statements from the prosecutor, emphasizing portions of his pre-sentence memoranda (S. 5-19), defense counsel (S. 19-24), and Johnson, who still proclaimed his innocence (S. 24-31). Justice Grella also considered the prosecution's pre-sentencing memorandum (S. 31-32), which included: (1) information regarding on-going criminal investigations focused on Johnson's drug-dealing activities; (2) information drawn from the same confidential sources provided to Justice Grella at trial; (3) a detailed list of Johnson's criminal record, including an October 2003 arrest related to heroin distribution; and (4) allegations that Johnson had committed perjury at trial and in the grand jury. (Dkt. No. 12: Ex. A: Pre-sentence Memo; S. 5-17.) Defense counsel objected to the inclusion of information from anonymous sources but otherwise did not oppose the pre-sentence memorandum. (S. 20-22.) Justice Grella did not indicate what weight he gave each source or elaborate on his rationale behind the sentencing. (See S. 32.)

**Johnson's Direct Appeals and New Suppression Hearing**

        In October 2006, Johnson's new counsel (the Center for Appellate Litigation), appealed to the First Department, claiming inter alia that:  (1) the hearing court erred in ruling that Johnson lacked standing to request a Mapp hearing when he denied possessing the gun (Dkt. No. 12: Ex. B: Johnson 1st Dep't Br. at 36-39); (2) Justice Grella violated Johnson's "right to a fair trial and to present a defense" by "precluding any evidence about [Horton's] police brutality allegations" (Johnson 1st Dep't Br. at 40-48); (3) Justice Grella "violated basic notions of fairness and due process" by modifying his in limine ruling to allow the prosecutor to cross-examine Johnson about uncharged drug crimes (Johnson 1st Dep't Br. at 48-54); and (4) Johnson's thirteen year sentence was "excessive" and a violation of his "right to due process" because the prosecution's pre-sentence memorandum included "unreliable hearsay allegations from anonymous informants" (Johnson 1st Dep't Br. at 54-61).

        On July 12, 2007, the First Department ruled that Johnson's appeal would be "held in abeyance and the matter remanded for a hearing on his motion to suppress physical evidence." People v. Johnson, 42 A.D.3d 341, 343, 839 N.Y.S.2d 741, 743 (1st Dep't 2007).  The First Department found that:

> A defendant seeking suppression of evidence has the burden of establishing standing by demonstrating a legitimate expectation of privacy in the premises or object searched.  In the context of a motion to suppress tangible evidence, a defendant may rely on the People's proof to demonstrate standing.  Defendant could meet his evidentiary burden by utilizing a police officer's statement that the tangible property in question was seized from his person.  "Defendant was therefore not required to personally admit possession of the contraband in order to comply with the factual pleading requirement of CPL 710.60."

Defendant's motion to suppress states that "while visiting a friend at the premises, 118 Avenue D, [he] was searched by the police without any probable cause, or justification, at which time the police recovered a gun from the possession of the defendant." Although in his grand jury testimony defendant denied ever possessing a gun on the night in question, the police aver that the gun was seized from his waistband area.  Moreover, defendant claims he was doing nothing illegal or improper when confronted by the police with drawn weapons.  While the normal questions of credibility arise between the two versions of the event leading to defendant's arrest, defendant's claim "questions whether police action was legally authorized at its inception, and in this situation a hearing is required to determine, as a factual matter, whether the defendant engaged in suspicious or unlawful conduct giving rise to probable cause justifying the search."  It was thus improper to deny defendant's motion summarily.

People v. Johnson, 42 A.D.3d at 343, 839 N.Y.S.2d at 743 (citations & fns. omitted).

Justice Charles Solomon held a Mapp hearing on September 27 and October 4, 2007 in accordance with the Fist Department's ruling.  (Dkt. No. 11: State Br. at 16.)[11/]  The evidence presented was "substantially similar" to that presented at trial, see People v. Johnson, 51 A.D.3d at 508, 859 N.Y.S.2d at 412, and established:

Cawley's knowledge that the area was a high crime one; the observation of a volatile scene with people frantically running out of the building, frightened, screaming and pointing behind them; one of the Officer[]s supposedly telling Cawley that the perpetrators had gone upstairs; and the police[] hearing [Johnson] banging and yelling on an apartment door frantically asking to be let inside while sweating profusely.

---

[11/]     The State was unable to obtain copies of the hearing transcript or Justice Solomon's decision. (State Br. at 16 n.8.)  Therefore, descriptions of the hearing and decision are taken from Johnson's supplemental appeal brief (Ex. O: Johnson 1st Dep't Supp. Br.) and the First Department's decision denying Johnson's direct appeal, People v. Johnson, 51 A.D.3d 508, 859 N.Y.S.2d 411 (1st Dep't 2008).

(Ex. O: Johnson 1st Dep't Supp. Br. at 11.)  See also People v. Johnson, 51 A.D.3d at 508, 859 N.Y.S.2d at 412.  Although Johnson's clothing did not match any of the descriptions in the 911 calls, the 911 calls were "'clearly corroborated by subsequent observations made at the scene as well as by defendant's highly suspicious behavior'" (Ex. O: Johnson 1st Dep't Supp. Br. at 11), and Justice Solomon concluded that the police "possessed reasonable suspicion to seize [Johnson] at gunpoint." (Ex. O: Johnson 1st Dep't Supp. Br. at 12).  Based on their reasonable suspicion, when Johnson "reached for his waistband, the police were justified . . . in the recovery of the gun" (Ex. O: Johnson 1st Dep't Supp. Br. at 12).  Accordingly, Justice Solomon again denied Johnson's suppression motion. See People v. Johnson, 51 A.D.3d at 508-09, 859 N.Y.S.2d at 412.

_____On May 13, 2008, the First Department denied Johnson's appeal.  People v. Johnson, 531 A.D.3d at 508-09, 859 N.Y.S.2d at 412.  The First Department's opinion approved the results of the Mapp hearing, finding that Johnson's "behavior, and, in particular, his direction of flight as compared with that of other persons at the scene, suggested that, unlike the others, he was fleeing from the police rather than escaping from danger."  People v. Johnson, 51 A.D.3d at 509, 859 N.Y.S.2d at 412.  "Accordingly, the police were entitled to forcibly detain [Johnson]" and "[o]nce [Johnson] reached for his waistband, the officers' suspicions became even more elevated, providing them with further justification for conducting a pat down."  People v. Johnson, 51 A.D.3d at 509, 859 N.Y.S.2d at 412.

The First Department also denied the remaining issues raised in Johnson's original direct appeal:

Turning to the issues defendant raised on his original appeal, which we held in abeyance pending a suppression hearing, we find no basis for reversal. The trial court properly exercised its discretion in precluding, on the ground of excessive remoteness, evidence offered to establish a motive for the police to fabricate, and this ruling did not deprive defendant of any constitutional right. Although the trial court erred in ruling that defendant's testimony opened the door to a modification of its prior ruling that had precluded the prosecutor from questioning defendant about uncharged drug crimes, the error was harmless in light of the overwhelming evidence of defendant's guilt.

We perceive no basis for reducing the sentence. [Johnson's] remaining claims relating to his sentence are without merit.

People v. Johnson, 51 A.D.3d at 509, 859 N.Y.S.2d at 412 (citations omitted).

On August 29, 2008, the New York Court of Appeals denied leave to appeal. People v. Johnson, 11 N.Y.3d 738, 864 N.Y.S.2d 396 (2008).

On September 22 and 23, 2008, Johnson, pro se, requested reconsideration of the denial of his leave application, arguing that his behavior at the time of his arrest did not constitute grounds for reasonable suspicion. (Ex. U: 9/22/08 Johnson Ltr. at 2-3 & 9/23/08 Johnson Ltr. at 2-3.) On November 21, 2008, the New York Court of Appeals denied Johnson's application for reconsideration. (Ex. W: Certificate Denying Application for Reconsideration at 1.)

**Johnson's CPL § 440 Motion**

On November 14, 2006, while his direct appeal was pending, Johnson's appellate counsel filed a CPL § 440.20 motion arguing inter alia that the prosecution placed "unreliable, highly prejudicial" information before the sentencing court. (Dkt. No. 12: Ex. F: Johnson 440 Br. at 3-5.)

On May 24, 2007, Justice Arlene R. Silverman denied Johnson's CPL § 440.20 motion, holding that:

> The sentence imposed by Justice Grella is not illegal on its face.  The issues raised
> herein have all been raised on defendant's appeal.  They relate to matters which fully
> appear on the record of the trial and subsequent sentencing.  In view of the foregoing,
> defendant's motion before this Court to set aside his sentence as illegal is denied.

(Ex. I: 5/24/07 Justice Silverman Order at 1.)

On July 17, 2007, the First Department granted Johnson leave to appeal from the § 440.20 denial and consolidated it with Johnson's pending direct appeal.  (Ex. L: 7/17/07 1st Dep't Order at 1 & n.1.)

Johnson's appellate counsel filed a second supplemental brief with the First Department restating the arguments raised in Johnson's CPL § 440.20 motion.  (Ex. M: Johnson 2d Supp. 1st Dep't Br. at 14.)

On June 24, 2008, the First Department affirmed the 440 court's denial of Johnson's § 440.20 motion.  People v. Johnson, 52 A.D.3d 402, 402, 859 N.Y.S.2d 367, 367 (1st Dep't 2008). The First Department held that Johnson failed to establish that his sentence was "'unauthorized, illegally imposed or otherwise invalid as a matter of law.'"  People v. Johnson, 52 A.D.3d at 402, 859 N.Y.S.2d at 367.  The First Department held that "[m]ost of [Johnson's] present claims are identical to claims that [the First Department] has already rejected on his direct appeal" and thus are "barred by the doctrine of res judicata," and "in any event" are "without merit."  People v. Johnson, 52 A.D.3d at 402, 859 N.Y.S.2d at 367.  "To the extent that [Johnson] raises additional challenges to his sentence, [the First Department] likewise find them without merit."  People v. Johnson, 52 A.D.3d at 402, 859 N.Y.S.2d at 367.

On September 12, 2008, the New York Court of Appeals denied leave to appeal, People v. Johnson, 11 N.Y.3d 789, 866 N.Y.S.2d 616 (2008), and denied reconsideration on November 21, 2008, People v. Johnson, 11 N.Y.3d 855, 872 N.Y.S.2d 78 (2008).

## Johnson's Habeas Petition

On August 10, 2009 (docketed as of November 16, 2009), Johnson filed his initial pro se federal habeas corpus petition, arguing that the police lacked probable cause to search him and that the gun should have been suppressed. (Dkt. No. 2: Petition ¶13.) On November 16, 2009, Chief Judge Preska dismissed Johnson's habeas petition because "Fourth Amendment claims are not reviewable in a federal habeas corpus petition," but granted Johnson sixty days to amend to assert "any other grounds with respect to which petitioner has exhausted his state court remedies." (Dkt. No. 3: Judge Preska Order at 2-3.)

On January 15, 2010, Johnson filed his present pro se habeas petition, asserting three claims. (Dkt. No. 5: Am. Pet. ¶ 13.) First, Johnson argues that Justice Grella violated his "right to a fair trial and to present a defense" by improperly excluding third-party allegations of police brutality. (Am. Pet. ¶ 13(1).) Second, Johnson argues that Justice Grella violated his due process rights by modifying the in limine ruling and allowing the "prosecution to extensively question [Johnson] about uncharged drug crimes." (Am. Pet. ¶ 13(2).) Third, Johnson argues that in sentencing him, Justice Grella improperly relied upon the prosecution's pre-sentence memorandum that included "unreliable hearsay allegations from anonymous informants concerning [Johnson]'s criminal history." (Am. Pet. ¶ 13(3).)

**ANALYSIS**

## I.  THE AEDPA REVIEW STANDARD

Before the Court can determine whether petitioner is entitled to federal habeas relief, the Court must address the proper habeas corpus review standard under the Antiterrorism and Effective Death Penalty Act ("AEDPA").

In enacting the AEDPA, Congress significantly "modifie[d] the role of federal habeas courts in reviewing petitions filed by state prisoners." Williams v. Taylor, 529 U.S. 362, 403, 120 S. Ct. 1495, 1518 (2000). The AEDPA imposed a more stringent review standard, as follows:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)  . . . was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).[12]

---

[12]     See also, e.g., Knowles v. Mirzayance, 129 S. Ct. 1411, 1418 (2009); Henry v. Poole, 409 F.3d 48, 67 (2d Cir. 2005), cert. denied, 547 U.S. 1040, 126 S. Ct. 1622 (2006); Howard v. Walker, 406 F.3d 114, 121-22 (2d Cir. 2005); Cox v. Donnelly, 387 F.3d 193, 197 (2d Cir. 2004); Dallio v. Spitzer, 343 F.3d 553, 559-60 (2d Cir. 2003), cert. denied, 541 U.S. 961, 124 S. Ct. 1713 (2004); Eze v. Senkowski, 321 F.3d 110, 120 (2d Cir. 2003) ("AEDPA changed the landscape of federal habeas corpus review by 'significantly curtail[ing] the power of federal courts to grant the habeas petitions of state prisoners.'") (quoting Lainfiesta v. Artuz, 253 F.3d 151, 155 (2d Cir. 2001), cert. denied, 535 U.S. 1019, 122 S. Ct. 1611 (continued...)

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have "independent meaning." <u>Williams</u> v. <u>Taylor</u>, 529 U.S. at 404-05, 120 S. Ct. at 1519.[13/]  Both, however, "restrict[] the source of clearly established law to [the Supreme] Court's jurisprudence." <u>Williams</u> v. <u>Taylor</u>, 529 U.S. at 412, 120 S. Ct. at 1523.[14/]  "That federal law, as defined by the Supreme Court, may be either a generalized standard enunciated in the [Supreme] Court's case law or a bright-line rule designed to effectuate such a standard in a particular context." <u>Kennaugh</u> v.

<hr>

[12/]     (...continued)
          (2002)).

[13/]     Accord, <u>e.g.</u>, <u>Henry</u> v. <u>Poole</u>, 409 F.3d at 68; <u>Howard</u> v. <u>Walker</u>, 406 F.3d at 122; <u>Parsad</u> v. <u>Greiner</u>, 337 F.3d 175, 181 (2d Cir.), <u>cert. denied</u>, 540 U.S. 1091, 124 S. Ct. 962 (2003); <u>Jones</u> v. <u>Stinson</u>, 229 F.3d 112, 119 (2d Cir. 2000); <u>Lurie</u> v. <u>Wittner</u>, 228 F.3d 113, 125 (2d Cir. 2000), <u>cert. denied</u>, 532 U.S. 943, 121 S. Ct. 1404 (2001); <u>Clark</u> v. <u>Stinson</u>, 214 F.3d 315, 320 (2d Cir. 2000), <u>cert. denied</u>, 531 U.S. 1116, 121 S. Ct. 865 (2001).

[14/]     Accord, <u>e.g.</u>, <u>Georgison</u> v. <u>Donelli</u>, 588 F.3d 145, 153-54 (2d Cir. 2009); <u>Dunlap</u> v. <u>Burge</u>, 583 F.3d 160, 164 (2d Cir.), <u>cert. denied</u>, 130 S. Ct. 642, (2009); <u>Carey</u> v. <u>Musladin</u>, 549 U.S. 70, 127 S. Ct. 649, 654 (2006) ("Given the lack of holdings from the Court regarding this [issue], it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'"); <u>Yarborough</u> v. <u>Alvarado</u>, 541 U.S. 652, 659, 124 S. Ct. 2140, 2147 (2004) ("We look for 'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.'"); <u>Wiggins</u> v. <u>Smith</u>, 539 U.S. 510, 519, 123 S. Ct. 2527, 2534 (2003); <u>Lockyer</u> v. <u>Andrade</u>, 538 U.S. 63, 72, 123 S. Ct. 1166, 1172 (2003) ("Section 2254(d)(1)'s 'clearly established' phrase 'refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'"); <u>Hargett</u> v. <u>Giambruno</u>, 291 Fed. Appx. 402, 403 (2d Cir. 2008); <u>Howard</u> v. <u>Walker</u>, 406 F.3d at 122; <u>Tueros</u> v. <u>Greiner</u>, 343 F.3d 587, 591 (2d Cir. 2003), <u>cert. denied</u>, 541 U.S. 1047, 124 S. Ct. 2171 (2004); <u>Parsad</u> v. <u>Greiner</u>, 337 F.3d at 181; <u>DelValle</u> v. <u>Armstrong</u>, 306 F.3d 1197, 1200 (2d Cir. 2002); <u>Yung</u> v. <u>Walker</u>, 341 F.3d 104, 109-110 (2d Cir. 2003); <u>Kennaugh</u> v. <u>Miller</u>, 289 F.3d 36, 42 (2d Cir.), <u>cert. denied</u>, 537 U.S. 909, 123 S. Ct. 251 (2002); <u>Loliscio</u> v. <u>Goord</u>, 263 F.3d 178, 184 (2d Cir. 2001); <u>Sellan</u> v. <u>Kuhlman</u>, 261 F.3d 303, 309 (2d Cir. 2001).

Miller, 289 F.3d at 42; accord, e.g., Davis v. Grant, 532 F.3d 132, 140 (2d Cir. 2008), cert. denied,

129 S. Ct. 1312 (2009).  "A petitioner can not win habeas relief solely by demonstrating that the state

court unreasonably applied Second Circuit precedent."  Yung v. Walker, 341 F.3d at 110; accord,

e.g., DelValle v. Armstrong, 306 F.3d at 1200.

> As to the "contrary to" clause:
>
> A state-court decision will certainly be contrary to [Supreme Court] clearly
> established precedent if the state court applies a rule that contradicts the governing
> law set forth in [Supreme Court] cases. . . .  A state-court decision will also be
> contrary to [the Supreme] Court's clearly established precedent if the state court
> confronts a set of facts that are materially indistinguishable from a decision of [the
> Supreme] Court and nevertheless arrives at a result different from [Supreme Court]
> precedent.

Williams v. Taylor, 529 U.S. at 405-06, 120 S. Ct. at 1519-20.[15/]

> In Williams, the Supreme Court explained that "[u]nder the 'unreasonable application'

clause, a federal habeas court may grant the writ if the state court identifies the correct governing

---

[15/]     Accord, e.g., Knowles v. Mirzayance, 129 S. Ct. at 1419 (The Supreme "Court has held on
numerous occasions that it is not 'an unreasonable application of clearly established federal
law' for a state court to decline to apply a specific legal rule that has not been squarely
established by this [Supreme] Court.") (quotation omitted); Brown v. Payton, 544 U.S. 133,
125 S. Ct. 1432, 1438-39 (2005); Bell v. Cone, 543 U.S. 447, 452-53, 125 S. Ct. 847, 851
(2005); Price v. Vincent, 538 U.S. 634, 640, 123 S. Ct. 1848, 1853 (2003); Lockyer v.
Andrade, 123 S. Ct. at 1173-74; Bierenbaum v. Graham, 607 F.3d 36, 47-48 (2d Cir. 2010);
Ortiz v. N.Y.S. Parole in Bronx, N.Y., 586 F.3d 149, 156 (2d Cir. 2009); Dunlap v. Burge,
583 F.3d at 164; Davis v. Grant, 532 F.3d at 140; Hawkins v. Costello, 460 F.3d 238, 242
(2d Cir. 2006), cert. denied, 549 U.S. 1215, 127 S. Ct. 1267 (2007); Henry v. Poole, 409 F.3d
at 68; Howard v. Walker, 406 F.3d at 122; Rosa v. McCray, 396 F.3d 210, 219 (2d Cir.),
cert. denied, 546 U.S. 889, 126 S. Ct. 215 (2005); Tueros v. Greiner, 343 F.3d at 591;
DelValle v. Armstrong, 306 F.3d at 1200; Yung v. Walker, 341 F.3d at 109; Kennaugh v.
Miller, 289 F.3d at 42; Loliscio v. Goord, 263 F.3d at 184; Lurie v. Wittner, 228 F.3d at 127-
28.

legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." <u>Williams</u> v. <u>Taylor</u>, 529 U.S. at 413, 120 S. Ct. at 1523.[16/] However, "[t]he term 'unreasonable' is . . . difficult to define." <u>Williams</u> v. <u>Taylor</u>, 529 U.S. at 410, 120 S. Ct. at 1522.  The Supreme Court made clear that "an <u>unreasonable</u> application of federal law is different from an <u>incorrect</u> application of federal law." <u>Id</u>.[17/] Rather, the issue is "whether the state court's application of clearly established federal law was objectively unreasonable." <u>Williams</u> v. <u>Taylor</u>,

---

[16/]    Accord, <u>e.g.</u>, <u>Wadddington</u> v. <u>Sarausad</u>, 129 S. Ct. 823, 831 (2009); <u>Brown</u> v. <u>Payton</u>, 544 U.S. at 141, 125 S. Ct. at 1439; <u>Wiggins</u> v. <u>Smith</u>, 539 U.S. at 520, 123 S. Ct. at 2534-35; <u>Bierenbaum</u> v. <u>Graham</u>, 607 F.3d at 48; <u>Brisco</u> v. <u>Ercole</u>, 565 F.3d 80, 87 (2d Cir.), <u>cert. denied</u>, 130 S. Ct. 739 (2009); <u>Jones</u> v. <u>West</u>, 555 F.3d 90, 96 (2d Cir. 2009); <u>Davis</u> v. <u>Grant</u>, 532 F.3d at 140; <u>Lynn</u> v. <u>Bliden</u>, 443 F.3d 238, 246 (2d Cir. 2006), <u>cert. denied</u>, 549 U.S. 1257, 127 S. Ct. 1383 (2007); <u>Howard</u> v. <u>Walker</u>, 406 F.3d at 122; <u>Parsad</u> v. <u>Greiner</u>, 337 F.3d at 181.

[17/]    See also, <u>e.g.</u>, <u>Renico</u> v. <u>Lett</u>, 130 S. Ct. 1855, 1862 (May 3, 2010); <u>Wadddington</u> v. <u>Sarausad</u>, 129 S. Ct. at 831; <u>Yarborough</u> v. <u>Alvarado</u>, 541 U.S. at 664, 124 S. Ct. at 2150; <u>Wiggins</u> v. <u>Smith</u>, 539 U.S. at 520, 123 S. Ct. at 2535; <u>Price</u> v. <u>Vincent</u>, 538 U.S. at 641, 123 S. Ct. at 1853 ("As we have explained: '[A] federal habeas court may not issue the writ simply because that court concludes that the state-court decision applied [a Supreme Court case] incorrectly.'") (quoting <u>Woodford</u> v. <u>Visciotti</u>, 537 U.S. 19, 24-25, 123 S. Ct. 357, 360 (2002)); <u>Lockyer</u> v. <u>Andrade</u>, 538 U.S. at 75, 123 S. Ct. at 1175; <u>Dunlap</u> v. <u>Burge</u>, 583 F.3d at 165-66 (A "federal court might agree with a petitioner that the relevant federal law should have been interpreted differently than the way it was interpreted by the state court yet still conclude that the state court's application of federal law was not unreasonable."); <u>Brisco</u> v. <u>Ercole</u>, 565 F.3d at 87-88; <u>Jones</u> v. <u>West</u>, 555 F.3d at 96; <u>Davis</u> v. <u>Grant</u>, 532 F.3d at 140; <u>Hawkins</u> v. <u>Costello</u>, 460 F.3d at 243; <u>Lynn</u> v. <u>Bliden</u>, 443 F.3d at 246; <u>Henry</u> v. <u>Poole</u>, 409 F.3d at 68; <u>Howard</u> v. <u>Walker</u>, 406 F.3d at 122; <u>Rosa</u> v. <u>McCray</u>, 396 F.3d at 219; <u>Cox</u> v. <u>Donnelly</u>, 387 F.3d at 197; <u>Eze</u> v. <u>Senkowski</u>, 321 F.3d at 124-25; <u>DelValle</u> v. <u>Armstrong</u>, 306 F.3d at 1200 ("With regard to issues of law, therefore, if the state court's decision was not an unreasonable application of, or contrary to, clearly established federal law as defined by Section 2254(d), we may not grant habeas relief even if in our judgment its application was erroneous.").

529 U.S. at 409, 120 S. Ct. at 1521.[18/]  "Objectively unreasonable" is different from "clear error."

Lockyer v. Andrade, 538 U.S. at 75, 123 S. Ct. at 1175 ("The gloss of clear error fails to give proper

deference to state courts by conflating error (even clear error) with unreasonableness.").  This is a

"substantially higher threshold" than incorrectness.  Renico v. Lett, 130 S. Ct. at 1862; accord, e.g.,

Knowles v. Mirzayance, 129 S. Ct. at 1420.[19/]  "[T]he range of reasonable judgment can depend in

part on the nature of the relevant rule."  Yarborough v. Alvarado, 541 U.S. at 663, 124 S. Ct. at

2149.[20/]  "Even if the state court issues a decision 'contrary to' clearly established Supreme Court

---

[18/]    Accord, e.g., Yarborough v. Alvarado, 541 U.S. at 664, 124 S. Ct. at 2150; Wiggins v. Smith, 539 U.S. at 520-21, 123 S. Ct. at 2535; Price v. Vincent, 538 U.S. at 641, 123 S. Ct. at 1853; Lockyer v. Andrade, 538 U.S. at 75, 123 S. Ct. at 1174-75; Woodford v. Visciotti, 537 U.S. at 25-27, 123 S. Ct. at 360-61; Dunlap v. Burge, 583 F.3d at 165; Davis v. Grant, 532 F.3d at 140; Mosby v. Senkowski, 470 F.3d 515, 519 (2d Cir. 2006), cert. denied, 552 U.S. 836, 128 S. Ct. 75 (2007); Hawkins v. Costello, 460 F.3d at 243; Lynn v. Bliden, 443 F.3d 246; Henry v. Poole, 409 F.3d at 68; Howard v. Walker, 406 F.3d at 122; Cox v. Donnelly, 387 F.3d at 197; Eze v. Senkowski, 321 F.3d at 125; Ryan v. Miller, 303 F.3d 231, 245 (2d Cir. 2002); Loliscio v. Goord, 263 F.3d at 184; Lurie v. Wittner, 228 F.3d at 128-29.

[19/]    However, the Second Circuit has explained "that while '[s]ome increment of incorrectness beyond error is required . . . the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence.'" Jones v. Stinson, 229 F.3d at 119 (quoting Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000)).; accord, e.g., Brisco v. Ercole, 565 F.3d at 88; Jones v. West, 555 F.3d at 96; Brown v. Alexander, 543 F.3d 94, 100 (2d Cir. 2008) ("[W]e have observed that the "unreasonable application 'standard falls somewhere between merely erroneous and unreasonable to all reasonable jurists.'"); Davis v. Grant, 532 F.3d at 140; Lynn v. Bliden, 443 F.3d at 246; Henry v. Poole, 409 F.3d at 68; Howard v. Walker, 406 F.3d at 122; Rosa v. McCray, 396 F.3d at 219; Cox v. Donnelly, 387 F.3d at 197, 200-01; Eze v. Senkowski, 321 F.3d at 125; Ryan v. Miller, 303 F.3d at 245; Yung v. Walker, 341 F.3d at 110; Loliscio v. Goord, 263 F.3d at 184.

[20/]    The Supreme Court explained:

(continued...)

law, . . . a petitioner 'cannot obtain relief . . . unless application of a *correct* interpretation of that

[Supreme Court] decision leads to the conclusion that his rights were violated.'" <u>Cousin</u> v. <u>Bennett</u>,

511 F.3d 334, 339 (2d Cir.), <u>cert. denied</u>, 128 S. Ct. 2910 (2008).

      Moreover, the Second Circuit has held "that a state court determination is reviewable

under AEDPA if the state decision unreasonably failed to extend a clearly established, Supreme

Court defined, legal principle to situations which that principle should have, in reason, governed."

<u>Kennaugh</u> v. <u>Miller</u>, 289 F.3d at 45.[21]

---

[20]    (...continued)

> [T]he range of reasonable judgment can depend in part on the nature of the relevant rule.  If a legal rule is specific, the range may be narrow.  Applications of the rule may be plainly correct or incorrect.  Other rules are more general, and their meaning must emerge in application over the course of time.  Applying a general standard to a specific case can demand a substantial element of judgment.  As a result, evaluating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.

<u>Yarborough</u> v. <u>Alvarado</u>, 541 U.S. at 663, 124 S. Ct. at 2149; <u>accord</u>, <u>e.g.</u>, <u>Renico</u> v. <u>Lett</u>, 130 S. Ct. at 1864; <u>Knowles</u> v. <u>Mirzayance</u>, 129 S. Ct. at 1426 (Where the Supreme Court "standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard."); <u>Ortiz</u> v. <u>N.Y.S. Parole in Bronx, N.Y.</u>, 586 F.3d at 157; <u>Dunlap</u> v. <u>Burge</u>, 583 F.3d at 166; <u>Hawkins</u> v. <u>Costello</u>, 460 F.3d at 243.

[21]    <u>Accord</u>, <u>e.g.</u>, <u>Bierenbaum</u> v. <u>Graham</u>, 607 F.3d at 47-48; <u>Davis</u> v. <u>Grant</u>, 532 F.3d at 140-41; <u>Tueros</u> v. <u>Greiner</u>, 343 F.3d at 591; <u>Yung</u> v. <u>Walker</u>, 341 F.3d at 109; <u>see</u> <u>Yarborough</u> v. <u>Alvarado</u>, 541 U.S. at 665-66, 124 S. Ct. at 2150-51 ("The petitioner contends that if a habeas court must extend a rationale before it can apply to the facts at hand then the rationale cannot be clearly established at the time of the state-court decision.  There is force to this argument.  Section 2254(d)(1) would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law.  At the same time, the difference between applying a rule and extending it is not always clear.  Certain principles
(continued...)

Under the AEDPA, in short, the federal courts "must give the state court's adjudication a high degree of deference." Yung v. Walker, 341 F.3d at 109; accord, e.g., Renico v. Lett, 130 S. Ct. at 1858 ("AEDPA thus imposes a 'highly deferential standard for evaluating state court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'") (citations omitted); Bell v. Cone, 543 U.S. at 455, 125 S. Ct. at 853; Mosby v. Senkowski, 470 F.3d at 519. "[I]t is the petitioner's burden to demonstrate that the state court applied the relevant clearly established law to the record in an unreasonable manner." Acosta v. Artuz, 575 F.3d 177, 184 (2d Cir. 2009); accord, e.g., Georgison v. Donelli, 588 F.3d at 154.

Even where the state court decision does not specifically refer to either the federal claim or to relevant federal case law, the deferential AEDPA review standard applies:

> For the purposes of AEDPA deference, a state court "adjudicate[s]" a state prisoner's federal claim on the merits when it (1) disposes of the claim "on the merits," and (2) reduces its disposition to judgment. When a state court does so, a federal habeas court must defer in the manner prescribed by 28 U.S.C. § 2254(d)(1) to the state court's decision on the federal claim – even if the state court does not explicitly refer to either the federal claim or to relevant federal case law.

Sellan v. Kuhlman, 261 F.3d at 312; accord, e.g., Bell v. Cone, 543 U.S. at 455, 125 S. Ct. at 853 ("Federal courts are not free to presume that a state court did not comply with constitutional dictates on the basis of nothing more than a lack of citation."); Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 365 (2002) (State court not required to cite Supreme Court cases, or even be aware of them, to be

---

[21/]   (...continued)
are fundamental enough that when new factual permutations arise, the necessity to apply the earlier rule will be beyond doubt.") (citations omitted).

entitled to AEDPA deference, "so long as neither the reasoning nor the result of the state-court decision contradicts them."); <u>Wilson</u> v. <u>Mazzuca</u>, 570 F.3d 490, 499 (2d Cir. 2009) ("Where, as here, 'a state court fails to articulate the rationale underlying its rejection of a petitioner's claim, and when that rejection is on the merits, the federal court will focus its review on whether the state court's ultimate decision was an unreasonable application of clearly established Supreme Court precedent.'").[22]  Even if the federal court holds an evidentiary hearing, the deferential AEDPA review standard applies.  <u>Wilson</u> v. <u>Mazzuca</u>, 570 F.3d at 501-02 ("Where . . . a district court has performed additional fact finding, the court must then ask whether the state court's decision 'was contrary to, or involved an unreasonable application of, clearly established Federal law,' . . . in light of any newly-discovered facts. . . . [W]e are directed to apply the same AEDPA standard that would otherwise be in force, now in light of the new information that has been obtained through a § 2254(e) hearing.").

---

[22]    See also, e.g., <u>Mosby</u> v. <u>Senkowski</u>, 470 F.3d at 519; <u>Hawkins</u> v. <u>Costello</u>, 460 F.3d at 243; <u>Lynn</u> v. <u>Bliden</u>, 443 F.3d at 246; <u>Howard</u> v. <u>Walker</u>, 406 F.3d at 122; <u>Rosa</u> v. <u>McCray</u>, 396 F.3d at 220; <u>Wade</u> v. <u>Herbert</u>, 391 F.3d 135, 140 (2d Cir. 2004) (Appellate Division held claim was "'without merit.'"  "Such a summary determination, even absent citation of federal case law, is a determination 'on the merits' and as such requires the deference specified by § 2254."  Moreover, "if any reasonable ground was available [for the state court's decision], we must assume the [state] court relied on it."); <u>Francolino</u> v. <u>Kuhlman</u>, 365 F.3d 137, 141 (2d Cir.) (Where "the Appellate Division concluded its opinion by stating that it had 'considered and rejected defendants' remaining claims,'" AEDPA deference applies.), <u>cert. denied</u>, 543 U.S. 872, 125 S. Ct. 110 (2004); <u>Jenkins</u> v. <u>Artuz</u>, 294 F.3d 284, 291 (2d Cir. 2002) ("In <u>Sellan</u>, we found that an even more concise Appellate Division disposition – the word 'denied' – triggered AEDPA deference.").

Where the state court decision is not clear as to whether it rests on federal law or state procedural law, the Second Circuit in <u>Jimenez</u> v. <u>Walker</u>, 458 F.3d 130, 145-46 (2d Cir. 2006), <u>cert. denied</u>, 549 U.S. 1133, 127 S. Ct. 976 (2007), instructed that the court must "examine the three clues laid out in <u>Coleman</u>, <u>Quirama</u> and <u>Sellan</u>" – that is, "(1) the face of the state-court opinion, (2) whether the state court was aware of a procedural bar, and (3) the practice of state courts in similar circumstances." <u>Jimenez</u> v. <u>Walker</u>, 458 F.3d at 145 & n.16; <u>accord</u>, <u>e.g.</u>, <u>Clark</u> v. <u>Perez</u>, 510 F.3d 382, 394 (2d Cir.), <u>cert. denied</u>, 129 S. Ct. 130 (2008). Using these three factors, the court should classify the decision as either:

> (1)     fairly appearing to rest primarily on federal law or to be interwoven with federal law or
>
> (2)     fairly appearing to rest primarily on state procedural law.

Absent a clear and express statement of reliance on a state procedural bar, the <u>Harris</u> presumption applies to decisions in the first category and deems them to rest on the merits of the federal claim. Such decisions are not procedurally barred and must be afforded AEDPA deference as adjudications "on the merits" under 28 U.S.C. § 2254(d). The <u>Harris</u> presumption does not apply to decisions in the second category, which show themselves to rest on an independent state procedural bar. Nor does it apply to decisions in the first category which contain a clear statement of reliance on a state procedural bar. No AEDPA deference is due to these decisions, but the state may successfully assert that habeas relief is foreclosed provided that the independent state procedural bar is adequate to support the judgment and that neither cause and prejudice nor a fundamental miscarriage of justice is shown.

The effect of these rules is to present federal habeas courts with a binary circumstance: we either apply AEDPA deference to review a state court's disposition of a federal claim or refuse to review the claim because of a procedural bar properly raised. The middle ground . . . does not exist.

Jimenez v. Walker, 458 F.3d at 145-46 (citations & fns. omitted); accord, e.g., Hawkins v. Costello, 460 F.3d at 242 ("In Jimenez v. Walker, we recently made clear that when a state court rejects a petitioner's claim as either unpreserved or without merit, the conclusive presumption is that the adjudication rested on the merits.").  Of course, "[i]f there is no [state court] adjudication on the merits [and no procedural bar], then the pre-AEDPA, de novo standard of review applies." Cotto v. Herbert, 331 F.3d 217, 230 (2d Cir. 2003); see also Wilson v. Mazzuca, 570 F.3d at 500 n.8; Jimenez v. Walker, 458 F.3d at 145 n.17.

Finally, "[i]f [the] court finds that the state court engaged in an unreasonable application of established law, resulting in constitutional error, it must next consider whether such error was harmless." Howard v. Walker, 406 F.3d at 122.

In addition to the standard of review of legal issues, the AEDPA provides a deferential review standard for state court factual determinations:  "a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1); accord, e.g., Bierenbaum v. Graham, 2010 WL 2036951 at *9; Lynn v. Bliden, 443 F.3d at 246-47; Rosa v. McCray, 396 F.3d at 220.  "The petitioner bears the burden of 'rebutting the presumption of correctness by clear and convincing evidence.'"  Parsad v. Greiner, 337 F.3d at 181 (quoting § 2254(e)(1)); accord, e.g., Bierenbaum v. Graham, 607 F.3d at 48 ("A state court's determination of a factual issue is presumed to be correct, and may only be rebutted by clear and convincing evidence."); Brown v. Alexander, 543 F.3d at 100; Lynn v. Bliden, 443 F.3d at 246-47.

## II.   JOHNSON'S CLAIM THAT HE WAS DENIED A FAIR TRIAL BASED ON STATE EVIDENTIARY ERRORS DOES NOT PROVIDE A BASIS FOR HABEAS RELIEF

Johnson claims that Justice Grella made two evidentiary errors that violated his right to a fair trial:  (1) improperly precluding evidence of Horton's excessive force allegations that would have established the police officers' motivation to fabricate testimony (Dkt. No.5: Am. Pet. ¶ 13(1)); and (2) improperly allowing the prosecution to question him about uncharged drug related activity (Am. Pet. ¶ 13(2)).  (See also Dkt. No. 16: Johnson 7/8/10 Traverse.)

### A.   The Habeas Corpus Review Standard for Claims of Error in State Evidentiary Rulings

"In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 502 U.S. 62, 68, 112 S. Ct. 475, 480 (1991) ("We have stated many times that 'federal habeas corpus relief does not lie for errors of state law.'").  Thus, a habeas petitioner must demonstrate that the allegedly-erroneous state court evidentiary rulings violated an identifiable constitutional right.  See, e.g., Rosario v. Kuhlman, 839 F.2d 918, 924 (2d Cir. 1988) ("The [habeas] court must determine whether the exclusion [of testimony] was an error of constitutional dimension. . . ."); Taylor v. Curry, 708 F.2d 886, 890-91 (2d Cir.) ("Erroneous [state court] evidentiary rulings do not automatically rise to the level of constitutional error sufficient to warrant issuance of a writ of habeas corpus.  Rather, the writ would issue only where petitioner can show that the error deprived her of a fundamentally fair trial.") (emphasis in original), cert. denied, 464 U.S. 1000, 104 S. Ct. 503 (1983).  That is a "heavy burden, for 'generally, rulings by state trial courts on evidentiary issues, even if erroneous,

do not rise to the level of a constitutional violation.'" Bonet v. McGinnis, 98 Civ. 6529, 2001 WL 849454 at *2 (S.D.N.Y. July 27, 2001).

The first step in this analysis is to determine whether the state court decision violated a state evidentiary rule, because the proper application of a presumptively constitutional state evidentiary rule could not be unconstitutional.[23] See, e.g., Brooks v. Artuz, 97 Civ. 3300, 2000 WL 1532918 at *6, 9 (S.D.N.Y. Oct. 17, 2000) (petitioner did not demonstrate an error under state evidentiary law, "much less" an error of constitutional magnitude); Jones v. Stinson, 94 F. Supp. 2d at 391-92 (once the habeas court has found that the state court ruling was not erroneous under state law, there is no need to apply a constitutional analysis).[24]

---

[23]   This assumes that the petitioner has not attacked the constitutionality of the state evidentiary rule itself. See Jones v. Stinson, 94 F. Supp. 2d 370, 387 n.19 (E.D.N.Y.) (distinguishing between cases "where an evidentiary rule was correctly applied as a matter of state law, but is either unconstitutional on its face or violates a constitutional right as applied," and cases where the petitioner took no exception to the constitutionality of the state evidentiary rule, but asserted that the state court decision misapplied the state rule, resulting in a constitutional violation), rev'd on other grounds, 229 F.3d 112 (2d Cir. 2000).

[24]   See also, e.g., Williams v. Walker, No. 00-CV-5912, 2001 WL 1352105 at *3 (E.D.N.Y. Oct. 31, 2001) (habeas court must first determine if ruling was erroneous under state law, and then whether ruling was of a constitutional magnitude); Coleman v. Greiner, No. 97-CV-2409, 1999 WL 320812 at *5 (E.D.N.Y. May 19, 1999); Till v. Miller, 96 Civ. 4387, 1998 WL 397848 at *4 (S.D.N.Y. July 16, 1998); Mitchell v. Herbert, 97 Civ. 5128, 1998 WL 186766 at *5-6 (S.D.N.Y. Apr. 20, 1998); Copes v. Schriver, 97 Civ. 2284, 1997 WL 659096 at *3 (S.D.N.Y. Oct. 22, 1997); Simmons v. Ross, 965 F. Supp. 473, 480 (S.D.N.Y. 1997); Dey v. Scully, 952 F. Supp. 957, 969 (E.D.N.Y. 1997) ("[T]he Court engages in a two part analysis, examining 1) whether the exclusion [of evidence] was error under state law, and 2) whether the error amounted to the denial of the constitutional right to a fundamentally fair trial."); see generally Davis v. Strack, 270 F.3d 111, 123-24 (2d Cir. 2001) (in determining whether failure to give state jury charge violated federal constitution, first question for
(continued...)

Second, the petitioner must allege that the state evidentiary error violated an identifiable constitutional right.  This necessarily eliminates consideration of purely state evidentiary errors not cognizable in the federal system.  See, e.g., Landy v. Costello, No. 97-2433, 141 F.3d 1151 (table), 1998 WL 105768 at *1 (2d Cir. Mar. 9, 1998) ("To the extent [petitioner's] claim is based on a Rosario violation, it must fail, because a habeas petition can only be granted to remedy some violation of federal law; the obligation to turn over Rosario material arises under state law.  Thus, the only question is whether the prosecution violated Brady.") (emphasis in original); Arocho v. Walker, 01 Civ. 1367, 2001 WL 856608 at *3 (S.D.N.Y. July 27, 2001); Ayala v. Hernandez, 712 F. Supp. 1069, 1074 (E.D.N.Y. 1989).

Third, an erroneous state evidentiary ruling that is asserted to be a constitutional violation will merit habeas relief only "'where [the] petitioner can show that the error deprived [him] of a fundamentally fair trial.'"  Rosario v. Kuhlman, 839 F.2d at 925 (emphasis in original).[25/]  The test for "fundamental fairness" is whether the excluded or improperly admitted evidence, "'evaluated

---

[24/]    (...continued)
         habeas court is whether the charge was required under New York law, and only if so, was the
         failure to give the charge of constitutional dimension).

[25/]    See also, e.g., Jones v. Stinson, 229 F.3d 112, 120 (2d Cir. 2000); Dunnigan v. Keane, 137
         F.3d 117, 125 (2d Cir.) ("The introduction of improper evidence against a defendant does not
         amount to a violation of due process unless the evidence 'is so extremely unfair that its
         admission violates fundamental conceptions of justice.'"), cert. denied, 525 U.S. 840, 119 S.
         Ct. 101 (1998); Collins v. Scully, 755 F.2d 16, 18 (2d Cir. 1985) ("In order to prevail on a
         [habeas] claim that an evidentiary error deprived the defendant of due process under the
         Fourteenth Amendment he must show that the error was so pervasive as to have denied him
         a fundamentally fair trial . . . . ").

in the context of the entire record,'"[26] "'create[d] a reasonable doubt [regarding petitioner's guilt] that did not otherwise exist.'" <u>Taylor</u> v. <u>Curry</u>, 708 F.2d at 891 (quoting the materiality standard defined in <u>United States</u> v. <u>Agurs</u>, 427 U.S. at 112-13, 96 S. Ct. at 2401-02).[27]

        The "fundamental fairness" standard applies to the erroneous exclusion or admission of evidence. <u>See</u>, <u>e.g.</u>, <u>Dowling</u> v. <u>United States</u>, 493 U.S. 342, 352, 110 S.Ct. 668, 674 (1990) (The introduction of improper evidence does not violate due process unless the evidence "is so extremely unfair that its admission violates 'fundamental conceptions of justice.'"); <u>McKinnon</u> v. <u>Superintendent, Great Meadow Corr. Facility</u>, 355 Fed. Appx. 469, 473 (2d Cir. 2009) ("[U]nless the challenged evidentiary rulings in the state proceedings affect the fundamental fairness of those proceedings, the claims are not properly reviewable . . . ."); <u>Young</u> v. <u>McGinnis</u>, 319 Fed. Appx. 12, 13 (2d Cir. 2009) ("Improperly admitted evidence can constitute a due process violation where it 'is so extremely unfair that its admission violates fundamental conceptions of justice.'"); <u>Cordon</u> v. <u>Greiner</u>, 225 Fed. Appx. 13, 15 (2d Cir. 2007); <u>Vega</u> v. <u>Portuondo</u>, 120 Fed. Appx. 380, 382 (2d

---

[26]    "If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." <u>United States</u> v. <u>Agurs</u>, 427 U.S. 97, 112-13, 96 S. Ct. 2392, 2402 (1976).

[27]    <u>Accord</u>, <u>e.g.</u>, <u>Bell</u> v. <u>Ercole</u>, 368 Fed. Appx. 216, 218 (2d Cir. 2010); <u>Rasmussen</u> v. <u>Filion</u>, 164 Fed. Appx. 56, 57 (2d Cir. 2006); <u>Hawkins</u> v. <u>Costello</u>, 460 F.3d 238, 244 (2d Cir. 2006), <u>cert. denied</u>, 549 U.S. 1215, 127 S. Ct. 1267 (2007); <u>Jones</u> v. <u>Stinson</u>, 229 F.3d at 120; <u>Justice</u> v. <u>Hoke</u>, 90 F.3d 43, 47 (2d Cir. 1996); <u>Johnson</u> v. <u>Ross</u>, 955 F.2d 178, 181 (2d Cir. 1992); <u>Blissett</u> v. <u>Lefevre</u>, 924 F.2d 434, 439 (2d Cir.), <u>cert. denied</u>, 502 U.S. 852, 112 S. Ct. 158 (1991); <u>Collins</u> v. <u>Scully</u>, 755 F.2d at 19; <u>Rosario</u> v. <u>Kuhlman</u>, 839 F.2d at 925.

Cir.) ("[T]he admission even of unfairly prejudicial evidence does not violate due process unless, taken in light of the record as a whole, it was sufficiently material to have removed a reasonable doubt that would otherwise have existed as to defendant's guilt."), cert. denied, 846 U.S. 836, 126 S. Ct. 66 (2005); Dunnigan v. Keane, 137 F.3d at 125 ("For the erroneous admission of . . . unfairly prejudicial evidence to amount to a denial of due process, the item must have been 'sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it.'") (quoting Johnson v. Ross, 955 F.2d at 181); Rodriguez v. O'Keefe, No. 96-2699, 122 F.3d 1057 (table), 1997 WL 557622 at *2 (2d Cir. Sept. 9, 1997), cert. denied, 522 U.S. 1123, 118 S. Ct. 1068 (1998); Collins v. Scully, 755 F.2d at 18-19; Roldan v. Artuz, 78 F. Supp. 2d 260, 276 (S.D.N.Y. 2000).[28/]

        The final question is how to apply the AEDPA in the context of a fundamental fairness analysis, an issue addressed by the Second Circuit in Jones v. Stinson, 229 F.3d at 120-21. In Jones, the state appellate court decided that the trial court's evidentiary rulings had not denied the

_____

[28/]    For the reasons stated by Judge Block in Dey v. Scully, "[h]armless error analysis is simply inapplicable to [trial] error that only attains constitutional significance when considered in the context of the entire trial because such analysis inheres in the initial finding that the error was constitutionally significant.  A determination that such error was not harmless, after having already concluded that it denied the defendant a fundamentally fair trial, would be tautological." Dey v. Scully, 952 F. Supp. at 974; see also, e.g., Kyles v. Whitley, 514 U.S. 419, 436, 115 S. Ct. 1555, 1567 (1995) ("Agurs . . . opted for its formulation of materiality . . . only after expressly noting that this standard would recognize reversible constitutional error only when the harm to the defendant was greater than the harm sufficient for reversal under Kotteakos."); Washington v. Schriver, 255 F.3d 45, 56-57 (2d Cir. 2001) ("The creation of otherwise non-existent reasonable doubt [under Agurs] satisfies the 'substantial and injurious' standard" under Brecht.) (quoting Jones v. Stinson, 229 F.3d at 120); Coleman v. Greiner, 1999 WL 320812 at *4-5.

defendant a fair trial.  <u>Id</u>. at 116.  The Second Circuit held that, although it might have found, under the <u>Agurs</u> standard, that one of the trial court's rulings "create[d] a reasonable doubt that did not otherwise exist," the Second Circuit could not conclude that the excluded testimony "would so certainly have created new ground for reasonable doubt that the appellate division's decision [affirming the trial court's ruling] was objectively unreasonable."  <u>Id</u>. at 120.  The Second Circuit thus denied habeas relief based on the AEDPA's deferential review standard.  <u>Id</u>. at 120-21.

> **B.**     **Justice Grella's Preclusion of Evidence Related to Horton's Excessive Force Allegations Did Not Violate Johnson's Right to a Fair Trial**

Johnson contends that Justice Grella's "preclusion of any evidence relating to [Horton's] excessive force allegations . . .  undermined the fundamental fairness of [his] trial and denied [him] his constitutional rights to present a defense, to confront the witnesses against him and to due process."  (Dkt. No. 12: Ex. B: Johnson 1st Dep't Br. at 41; <u>see</u> pages 1, 17, 22 above.)  Johnson's theory of the case was that Lt. Cawley, Officer Gordon and Officer Delmar arrested Johnson for "essentially no reason and then accused [him] of possessing the gun . . . <u>after</u> Horton had lodged his excessive force complaint" in order to provide the officers with an alibi.  (Ex. D: Johnson 1st Dep't Reply Br. at 7; <u>see</u> pages 4-5, 14-15 above.)   According to Johnson, Justice Grella improperly denied him the right to present this defense when it ruled that such evidence was "irrelevant," "self-serving hearsay" and "of no moment with regard to the issues that th[e] jury must decide and that is whether or not the People have proven the elements of the three charges in the indictment and in [Johnson]'s commission thereof."  (Dkt. No. 13: Tr. 382-84; <u>see</u> pages 5, 9 n.8 above.)

"Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.' . . .  [A]n essential component of procedural fairness is an opportunity to be heard." Crane v. Kentucky, 476 U.S. 683, 690, 106 S. Ct. 2142, 2146-47 (1986) (citations omitted); see, e.g., Chambers v. Mississippi, 410 U.S. at 294, 93 S. Ct. at 1045 ("The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations."); Wade v. Mantello, 333 F.3d 51, 57 (2d Cir. 2003) (right to present a meaningful defense is a fundamental constitutional right);  United States v. Blum, 62 F.3d 63, 67 (2d Cir. 1995) ("the Constitution guarantees criminal defendants the right to present a defense"); Williams v. Lord, 996 F.2d 1481, 1483 (2d Cir.1993), cert. denied, 510 U.S. 1120, 114 S. Ct. 1073 (1994); United States v. Almonte, 956 F.2d 27, 30 (2d Cir.1992) ("'[T]he right to present a defense is one of the "minimum essentials of a fair trial."'"); Rosario v. Kuhlmann, 839 F.2d 918, 924 (2d Cir.1988).[29]

A defendant's constitutional right to present a defense is not, however, without limitation:  "Restrictions on a defendant's presentation of evidence are constitutional if they serve 'legitimate interests in the criminal trial process,' and are not 'arbitrary or disproportionate to the purposes they are designed to serve.'" United States v. Almonte, 956 F.2d at 30 (quoting Rock v. Arkansas, 483 U.S. at 55-56, 107 S. Ct. at 2711); accord, e.g., United States v. Scheffer, 523 U.S.

---

[29]    See also, e.g., Taylor v. Illinois, 484 U.S. 400, 409, 108 S. Ct. 646, 653 (1988); Delaware v. Van Arsdall, 475 U.S. 673, 679, 106 S. Ct. 1431, 1435 (1986); Davis v. Alaska, 415 U.S. 308, 315-16, 94 S. Ct. 1105, 1110 (1974).

303, 118 S. Ct. 1261, 1264 (1998); Michigan v. Lucas, 500 U.S. at 151, 111 S. Ct. at 1747; Taylor

v. Illinois, 484 U.S. 400, 424, 108 S. Ct. 646, 660-61; United States v. Amato, 306 Fed. Appx. 630,

632 (2d Cir. 2009), cert. denied, 130 S. Ct. 1502 (2010); Buie v. Phillips, 298 Fed. Appx. 63, 65-66

(2d Cir. 2008); United States v. Stewart, 433 F.3d 273, 310-11 (2d Cir. 2006); Wade v. Mantello,

333 F.3d at 58; Grant v. Demskie, No. 99-2744, 234 F.3d 1262 (table), 2000 WL 1715224 at *3 (2d

Cir. Nov. 13, 2000);  Lurie v. Wittner, 228 F.3d 113, 133 (2d Cir. 2000), cert. denied, 532 U.S. 943,

121 S. Ct. 1404 (2001); United States v. Wilson, No. 99-1110, 201 F.3d 433 (table), 1999 WL

1295330 at *1 (2d Cir. Dec. 27, 1999); United States v. Blum, 62 F.3d at 67 (right to present a

defense "must be balanced against a court's leave to set reasonable limits on the admission of

evidence"); United States v. Holmes, 44 F.3d 1150,1157(2d Cir. 1995) ("Absent a clear abuse of

discretion, a trial judge retains a wide latitude to exclude irrelevant, repetitive, or cumulative

evidence."); Williams v. Lord, 996 F.2d at 1483; Buie v. Sullivan, 923 F.2d 10, 11 (2d Cir.1990)

("The right to present a defense, and its concomitant right to compulsory process, are not

unqualified; they are subject to 'countervailing public  interest. . . .'").[30]

---

[30]    The Supreme Court has recognized a "traditional reluctance to impose constitutional
constraints on ordinary evidentiary rulings by state trial courts.  In any given criminal case
the trial judge is called upon to make dozens, sometimes hundreds, of decisions concerning
the admissibility of evidence. . . .  [T]he Constitution leaves to the judges who must make
these decisions 'wide latitude' to exclude evidence that is 'repetitive . . . , only marginally
relevant' or poses an undue risk of 'harassment, prejudice [or] confusion of the issues.'"
Crane v. Kentucky, 476 U.S. at 689-90, 106 S. Ct. at 2146.  "Moreover, we have never
questioned the power of States to exclude evidence through the application of evidentiary
rules that themselves serve the interests of fairness and reliability – even if the defendant
would prefer to see that evidence admitted."  Crane v. Kentucky, 476 U.S. at 690, 106 S. Ct.
(continued...)

Under New York law, "[p]roof aimed at establishing a motive to fabricate is never collateral and may not be excluded on that ground."  People v. Ocampo, 28 A.D.3d 684, 685, 813 N.Y.S.2d 217, 218 (2d Dep't 2006), appeal denied, 11 N.Y.3d 792, 866 N.Y.S. 2d 618 (2008); accord, e.g., People v. Hudy, 73 N.Y.2d 40, 56-57, 538 N.Y.S.2d 197, 207 (1988), abrogated on other grounds by Carmell v. Texas, 529 U.S. 513, 120 S. Ct. 1620 (2000); People v. Poole, 55 A.D.3d 1349, 1350, 866 N.Y.S.2d 468, 468 (4th Dep't 2008), appeal denied, 11 N.Y.3d 929, 874 N.Y.S. 2d 14 (2009); People v. Garcia, 47 A.D.3d 830, 831, 849 N.Y.S.2d 637, 638 (2d Dep't), appeal denied, 16 N.Y.3d 863, 860 N.Y.S. 2d 489 (2008); People v. Mestres, 41 A.D.3d 618, 618, 838 N.Y.S.2d 164, 165 (2d Dep't), appeal denied, 9 N.Y.3d 924, 844 N.Y.S.2d 179 (2007); People v. Otega, 292 A.D.2d 792, 793, 740 N.Y.S.2d 539, 540 (4th Dep't), appeal denied, 98 N.Y.2d 679, 746 N.Y.S. 2d 468 (2002); People v. Barney, 277 A.D.2d 460, 460, 715 N.Y.S.2d 758, 759 (2d Dep't 2000), appeal denied, 96 N.Y.2d 825, 729 N.Y.S.2d 445 (2001).  On the other hand, "a trial court may, in the exercise of its discretion, properly exclude such proof where it is too remote or speculative or where the cross-examination concerning such motive is not proceeding upon some good-faith basis."  People v. Perry, 203 A.D. 2d 131, 131, 611 N.Y.S.2d 3, 3 (1st Dep't), appeal denied, 83 N.Y.2d 970, 616 N.Y.S. 2d 23 (1994); accord, e.g., People v. Poole, 55 A.D.3d at 1350,

---

[30]/    (...continued)
         at 2146.

H:\OPIN\JOHNSON-Mark

866 N.Y.S.2d at 468; People v. Garcia, 47 A.D.3d at 831, 849 N.Y.S.2d at 638; People v. Mestres,

41 A.D.3d at 618, 838 N.Y.S.2d at 165; People v. Otega, 292 A.D.2d at 793, 740 N.Y.S.2d at 540.[31]

      Here, Johnson sought to introduce evidence of Horton's withdrawn allegation of

excessive force against two unnamed police officers who were not involved in Johnson's arrest. (See

pages 4-5, 9 n.8 above.)  According to defense counsel, this evidence was relevant because "these

events were occurring more or less simultaneously. . . .[and] the officers needed to cover themselves

and their actions and they used Mr. Johnson in part to do that." (Tr. 382.)[32] Justice Grella precluded

all evidence concerning Horton's allegations of excessive force on the grounds that it was "hearsay"

(Horton was not called to testify) and "of no moment with regard to the issues that th[e] jury must

decide," namely, whether Johnson possessed a loaded firearm.  (Tr. 383-84; see pages 5, 9 n.8

above.)

---

[31]    See also, e.g., People v. Daily, 297 A.D.2d 562, 563, 747 N.Y.S.2d 85, 86 (1st Dep't)
("While bias of a witness is a proper subject of inquiry, defendant sought to delve into
matters that were speculative, remote and of dubious relevance."), appeal denied, 99 N.Y.2d
534, 752 N.Y.S.2d 595 (2002); People v. McKee, 272 A.D.2d 54, 54-55, 707 N.Y.S.2d 317,
318 (1st Dep't) (The court properly precluded "cross-examination that would have suggested
to the jury that a detective had framed defendant" where such questioning "would have been
purely speculative and without a good faith basis."), appeal denied, 95 N.Y.2d 868, 715
N.Y.S.2d 223 (2000).

[32]    Johnson's direct appeal elaborates on this theory, alleging that "police officers who testified
at [Johnson]'s trial had every reason to account for their actions in a manner that would have
placed them outside the lobby" where the supposed assault occurred.  (Johnson 1st Dep't Br.
at 40.) For this reason, Johnson's "seizure and arrest was essentially [the officers's] alibi
against Horton's claims of misconduct."  (Johnson 1st Dep't Br. at 40.)

This Court agrees that the proffered evidence was hearsay and was "too remote or speculative" to establish that the testifying officers had a "motive to fabricate."  Simply put, Johnson's  theory of a cover-up is implausible, and even were there competent evidence that other officers assaulted Horton (which there was not), the event would be "only marginally relevant" to the testifying officers' motive to lie.  Nor did defense counsel proffer any facts to establish a "good faith basis" for his claim of a cover-up.  Moreover, in a case involving the credibility of police officer witnesses, as this one was, evidence that other officers assaulted a civilian would have created an undue risk of prejudice or confusion of the issues properly before the jury.  See, e.g., United States v. Lawes, 292 F.3d 123, 131-32 (2d Cir. 2002) (Trial court properly barred defense cross-examination of the arresting police officer concerning a Civilian Complaint Review Board citation "for using excessive force against an arrestee in an unrelated case" because it had no bearing on the officer's motive to lie about finding a loaded firearm in the defendant's waistband, the "risk of distractions . . . substantially outweighed any probative value of the evidence."); United States v. Smith, 06 Cr. 203, 2007 WL 188734 at * 1 (S.D.N.Y. Jan. 24, 2007) (Cross-examination of arresting officers regarding "a prior adverse credibility finding" by the Civilian Complaint Review Board precluded because "[t]he proceedings before the CCRB lack formality, are unrelated to the instant action, and are only tangentially relevant if at all, and any minimal probative value that these incidents may have on [the officers'] credibility is substantially outweighed by the danger of unfair prejudice and delay.").

Even if precluding evidence of Horton's allegations was erroneous as a matter of state law (which it was not), the admission of hearsay testimony (from Johnson or Lt. Cawley) about Horton's allegations would not "so certainly have created new ground for reasonable doubt" that it provides ground for habeas relief.  Jones v. Stinson, 229 F.3d 112, 120 (2d Cir. 2000); see cases cited at pages 35-37 above.  The prosecution's evidence against Johnson was overwhelming:  both Lt. Cawley and Officer Gordon testified that they found a loaded nine millimeter pistol in Johnson's waistband (see pages 6-7 above); and Officer Delmar testified that he joined Lt. Cawley and Officer Gordon on the third floor "only a minute or two" after Johnson's arrest and took possession of the gun before Lt. Cawley searched apartment 3G (Delmar: Tr. 349).  Moreover, defense counsel introduced other evidence attacking the police officers' credibility and motive.  Specifically, defense counsel established that Johnson knew Officer Gordon and suggested that Officer Gordon was jealous of Johnson's relationship with Perillo and framed Johnson to get him "out of the way."  (See pages 9, 14-15 above.)  Similarly, during summations, defense counsel articulated his theory that the officers actually found the gun in apartment 3G, and offered a number of arguments as to why they would lie and frame Johnson.  (See pages 14-15 above.)

Given the strength of the evidence against Johnson, and the fact that the jury was presented with other evidence and argument that the police  had a motive to lie, preclusion of Horton's hearsay excessive force allegations did not deprive Johnson of a "fundamentally fair" trial.

In any event, under the deferential AEDPA standard, this Court cannot say that the First Department's denial of Johnson's claim constituted an unreasonable application of Supreme

Court Precedent.  See, e.g., Wade v. Mantello, 333 F.3d at 66 (upholding under AEDPA deference standard the Appellate Division's determination, that the trial court's decision to exclude third-party motive testimony that "would not have materially assisted the determination of Wade's guilt or innocence" did not violate defendant's right to present a defense).

Accordingly, Johnson's precluded evidence habeas claim should be DENIED.

### C.    The Admission of Uncharged Crimes Evidence Did Not Violate Johnson's Right to a Fair Trial

Johnson also argues that Justice Grella erroneously modified his in limine ruling to allow the prosecution to cross-examine Johnson about uncharged drug activities, violating his right to a fair trial. (See pages 1, 22 above.)

Under New York law, evidence of uncharged crimes is generally inadmissable so that the jury does not convict the defendant based on a perceived predisposition towards criminal conduct that is deserving of punishment rather than for guilt of the charged offense. E.g., People v. Molineux, 168 N.Y. 264, 291, 61 N.E. 286 (1901); see, e.g., United States v. Gelzer, 50 F.3d 1133, 1139 (2d Cir.1995); United States v. Concepcion, 983 F.2d 369, 392 (2d Cir.1992), cert. denied, 510 U.S. 856, 114 S.Ct. 163 (1993).[33]

---

[33]    See also, e.g., People v. Alvino, 71 N.Y.2d 233, 241, 525 N.Y.S.2d 7, 11 (1987); People v. Beam, 57 N.Y.2d 241, 250, 455 N.Y.S.2d 575, 579-80 (1982); People v. Ventimiglia, 52 N.Y.2d 350, 359, 438 N.Y.S.2d 261, 264 (1981); People v. Allweiss, 48 N.Y.2d 40, 46-47, 421 N.Y.S.2d 341, 344 (1979); People v. Vails, 43 N.Y.2d 364, 368, 401 N.Y.S.2d 479, 481 (1977); People v. Condon, 26 N.Y.2d 139, 143, 309 N.Y.S.2d 152, 154 (1970); People v. Davis, 259 A.D.2d 706, 687 N.Y.S.2d 653, 654 (2d Dep't), appeal denied, 93 N.Y.2d 1016, 697 N.Y.S.2d 575 (1999); People v. Kanston, 192 A.D.2d 721, 721, 597 N.Y.S.2d 152, 153
(continued...)

"However, when the evidence of the other crimes is relevant to an issue other than the defendant's criminal tendency, it may be admitted on the basis of an exception to the general rule, but only for the limited purpose for which it is relevant."  People v. Beam, 57 N.Y.2d at 250, 455 N.Y.S.2d at 579-80.[34]

"Even then, such evidence is admissible only upon a trial court finding that its probative value for the jury outweighs the risk of undue prejudice to the defendant."  People v. Till, 87 N.Y.2d at 836-37, 637 N.Y.S.2d at 682; accord, e.g., People v. Alvino, 71 N.Y.2d at 241-42, 525 N.Y.S.2d at 11.

In People v. Molineux, the New York Court of Appeals "stated what has come to be known as the five Molineux exceptions to the rule forbidding introduction of evidence of similar crimes." People v. Beam, 57 N.Y.2d at 250, 455 N.Y.S.2d at 580.  The New York Court of Appeals in Molineux held that "[g]enerally speaking, evidence of other crimes is competent to prove the specific crime charged when it tends to establish (1) motive; (2) intent; (3) the absence of mistake

---

[33]    (...continued)
(2d Dep't), appeal denied, 81 N.Y.2d 1074, 601 N.Y.S.2d 594 (1993); People v. Pons, 159 A.D.2d 471, 473, 552 N.Y.S.2d 344, 345 (2d Dep't), appeal denied, 76 N.Y.2d 741, 558 N.Y.S.2d 902 (1990); People v. Battles, 83 A.D.2d 164, 166, 443 N.Y.S.2d 932, 934 (4th Dep't 1981); People v. Le Grand, 76 A.D.2d 706, 708-09, 431 N.Y.S.2d 850, 852 (2d Dep't 1980).

[34]    Accord, e.g., People v. Till, 87 N.Y.2d 835, 837, 637 N.Y.S.2d 681, 682 (1995); People v. Alvino, 71 N.Y.2d at 241-42, 525 N.Y.S.2d at 11; People v. Ventimiglia, 52 N.Y.2d at 359-60, 438 N.Y.S.2d at 264; People v. Allweiss, 48 N.Y.2d at 46-47, 421 N.Y.S.2d at 344; People v. Vails, 43 N.Y.2d at 368, 401 N.Y.S.2d at 482; People v. Condon, 26 N.Y.2d at 143, 309 N.Y.S.2d at 154; People v. Molineux, 168 N.Y. at 293, 61 N.E. 286.

or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the others; (5) the identity of the person charged with the commission of the crime on trial." People v. Molineux, 168 N.Y. at 293, 61 N.E. at 286.[35/]  This list of exceptions is "illustrative and not exhaustive," People v. Rojas, 97 N.Y.2d 32, 37, 735 N.Y.S.2d 470, 473 (2001), and evidence that is necessary to provide "background material" or to "'complete the narrative of the episode'" has also become a recognized exception.  People v. Till, 87 N.Y.2d at 837, 637 N.Y.S.2d at 682 (citing People v. Gines, 36 N.Y.2d 932, 932-33, 373 N.Y.S.2d 543, 543 (1975)); see People v. Tosca, 98 N.Y.2d 660, 661, 746 N.Y.S.2d 276, 276 (2002) (background information about "how and why the police pursued and confronted defendant" admissible); People v. Then, 248 A.D.2d 159, 159, 670 N.Y.S.2d 182, 183 (1st Dep't) ("Evidence of the criminal conduct of a severed codefendant was properly admitted as highly probative of defendant's possession as well as being necessary to complete the narrative of events leading to defendant's arrest.") (citations omitted), appeal denied, 92 N.Y.2d 906, 680 N.Y.S.2d 71 (1998); People v. Henry, 166 A.D.2d 720, 720, 561 N.Y.S.2d 297, 298 (2d Dep't 1990) ("evidence of unconnected, uncharged criminal conduct . . . is also admissible to complete the narrative of the crime charged, provided its probative value outweighs any possible prejudice."), appeal denied, 77 N.Y.2d 907, 569 N.Y.S.2d 939 (1991).

---

[35/]    Accord, e.g., People v. Alvino, 71 N.Y.2d at 242, 525 N.Y.S.2d at 11; People v. Ventimiglia, 52 N.Y.2d at 359, 438 N.Y.S.2d at 264; People v. Allweiss, 48 N.Y.2d at 47, 421 N.Y.S.2d at 344; People v. Vails, 43 N.Y.2d at 368, 401 N.Y.S.2d at 482; People v. Condon, 26 N.Y.2d at 143, 309 N.Y.S.2d at 155.

Here, the prosecutor inquired whether Johnson dealt drugs in the Jacob Riis Houses, tried to engage Williams in that business, and secreted drugs in the back of the police car after his arrest.  (See pages 13-14 above.)  On direct appeal, the First Department found that Justice Grella erred by allowing the prosecution to pursue this line of questioning, but found "the error was harmless in light of the overwhelming evidence of defendant's guilt."  (See page 20 above.)

"An erroneous state evidentiary ruling does not automatically rise to the level of a federal constitutional violation,"  rather the petitioner "must demonstrate . . . that the purported error was serious enough to deny him a fundamentally fair trial."  Young v. McGinnis, 411 F. Supp. 2d 278, 317 (E.D.N.Y. 2006) (Weinstein, D.J.) (citations omitted), aff'd, 319 Fed. Appx. 12 (2d Cir. 2009); see cases cited in Section II.A above.  Here, the prosecutor asked only four questions regarding Johnson's uncharged criminal activity and Johnson denied the allegations.  (See pages 13-14 above.)  Moreover, because Johnson testified, the prosecutor was allowed to, and did, ask Johnson about his prior drug conviction.  (See pages 4 n.2, 14 above.)

Given the strong evidence against Johnson, the minimal questions about (and answers denying) the uncharged crimes, and the proper admission of evidence of Johnson's prior drug conviction, the prosecution's brief inquiry into Johnson's "uncharged crimes" did not deprive him of a fundamentally fair trial.  See, e.g., Reyes v. Ercole, No. 08-CV-4749, 2010 WL 2243360 at *10 (E.D.N.Y. June 1, 2010) (Petitioner was not deprived of a fundamentally fair trial "given the strong, indeed overwhelming, evidence against him."); Fuentes v. Ebert,  06 Civ. 5813, 2009 WL 1755500 at *16 (S.D.N.Y. June 22, 2009) ("[T]he strength of the evidence against Petitioner militates against

any finding that the prosecutor's remarks in summation, even if inappropriate, caused Petitioner actual prejudice."); Clanton v. Rivera, 06 Civ. 4756, 2008 WL 2839712 at *21 (S.D.N.Y. July 22, 2008) (Peck, M.J.) (Even if state court erred in admitting evidence of uncharged robbery, "any such error did not deprive [petitioner] of a fundamentally fair trial, given the strong evidence against him."), report & rec. adopted, 2010 WL 1685414 (S.D.N.Y. Apr. 22, 2010); Kanani v. Phillips, 03 Civ. 2534, 2004 WL 2296128 at *19 (S.D.N.Y. Oct. 13, 2009) (Peck, M.J.) (evidence errors did not deprive petitioner of a fundamentally fair trial where there was strong evidence of his guilt), report & rec. adopted, 2005 WL 2431416 (S.D.N.Y. Oct. 3, 2005); Oakley v. Artuz, No. 95 CV 2088, 1999 WL 325362 at *2 (E.D.N.Y. May 18, 1999) (Prior crime evidence did not warrant reversal where the "record contained overwhelming evidence of Petitioner's guilt."); Ayala v. Portuondo, 75 F. Supp. 2d 194, 196 (S.D.N.Y. 1999) (Parker, D.J.) ("In view of the overwhelming evidence of [petitioner]'s guilt, this [uncharged crimes] evidence cannot even if it had been erroneously admitted, be said to have denied [petitioner] a fair trial."); Diaz v. Garvin, 92 Civ. 4778, 1995 WL 459250 at *3 (S.D.N.Y. Aug. 3, 1995) (In case with overwhelming guilt against defendant, challenged uncharged crimes evidence "was not crucial, critical, or highly significant to petitioner's conviction, and therefore its admission did not deprive petitioner of a fair trial. . . . "); People v. Johnson, 280 A.D.2d 683, 684, 721 N.Y.2d 108, 109 (2d Dep't) ("[I]n light of the overwhelming evidence of the defendant's guilt [in rape and sexual assault trial], any error in the admission of this [uncharged violent crime] evidence was harmless."), appeal denied, 97 N.Y.2d 683, 738 N.Y.S.2d 299 (2001).

In any event, even if the First Department were wrong in holding the error to be harmless, this Court cannot say that the First Department's decision was an unreasonable application of Supreme Court precedent such as to allow habeas relief under the AEDPA.  See, e.g., Mercedes v. McGuire, No. 08-CV-299, 2010 WL 1936227 at *8 (E.D.N.Y. May 12, 2010) (Appellate Division's rejection of petitioner's claim, that the use of uncharged crimes violated his due process rights, was neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent because "the Supreme Court has never held that a criminal defendant's due process rights are violated by the introduction of prior bad acts or uncharged crimes."); Romero v. Rock, 08 Civ. 7791, 2010 WL 908844 at *13 (S.D.N.Y. Feb. 2, 2010) (Because "the Supreme Court has yet to establish clearly 'when the admission of prior crimes under state evidentiary laws can constitute a federal due process violation'" the trial court's "decision to admit [such] evidence subject to limiting instructions cannot be said to be 'contrary to' or an 'unreasonable application of' clearly-established federal law."); Tingling v. Donelli, 07 Civ. 1833, 2008 WL 4724567 at *9 (S.D.N.Y. Oct. 24, 2008) ("Not only would Petitioner's claim fail if analyzed under the Second Circuit precedent cited above, but, under AEDPA, it would also fail . . . as the Supreme Court has not directly held that due process is violated by the introduction at trial of evidence of a defendant's uncharged crimes."); Jones v. Conway, 442 F. Supp. 2d 113, 131 (S.D.N.Y. 2006) ("Given that the Supreme Court has not held that the use of uncharged crimes would violate the Due Process Clause, the Appellate Division's rejection of this claim is hardly either contrary to or an unreasonable application of clearly established Supreme Court law.").

H:\OPIN\JOHNSON-Mark

Accordingly, Johnson's uncharged crimes habeas claim should be <u>DENIED</u>.

## III. JOHNSON'S CLAIM THAT THE SENTENCING COURT IMPROPERLY CONSIDERED HEARSAY WHEN DETERMINING HIS SENTENCE IS WITHOUT MERIT

Johnson claims that the sentencing court improperly considered "unreliable hearsay allegations from anonymous informants" when setting his sentence.[36/]  (Dkt. No. 5: Am. Pet. ¶ 13(3).)  Specifically, Johnson alleges that the prosecution's pre-sentencing memorandum[37/] "relied

---

[36/]   It is undisputed that Johnson's sentence falls within the range prescribed by state law. Accordingly, the length of his sentence may not be raised as grounds for federal habeas relief. <u>See</u>, <u>e.g.</u>, <u>White</u> v. <u>Keane</u>, 969 F.2d 1381, 1383 (2d Cir. 1992) ("No federal constitutional issue is presented where, as here, the sentence is within the range prescribed by state law."); <u>Fabre</u> v. <u>Taylor</u>, 08 Civ. 5883, 2009 WL 162881 at *14 (S.D.N.Y. Jan. 20, 2009) (Peck, M.J.), <u>report & rec. adopted</u>, 2009 WL 1457169 (S.D.N.Y. May 26, 2009); <u>Garcia</u> v. <u>Rivera</u>, 07 Civ. 2535, 2007 WL 2325928 at *17 & n.18 (S.D.N.Y. Aug. 16, 2007) (Peck, M.J.) (& cases cited therein); <u>Thomas</u> v. <u>Senkowski</u>, 968 F. Supp. 953, 956 (S.D.N.Y. 1997) ("It is well established that, when a sentence falls within the range prescribed by state law, the length of the sentence may not be raised as grounds for federal habeas relief."); <u>see also</u>, <u>e.g.</u>, <u>Townsend</u> v. <u>Burke</u>, 334 U.S. 736, 741, 68 S. Ct. 1252, 1255 (1948) (severity of sentence generally not reviewable on habeas).  Second degree criminal possession of a weapon is a class C felony, Penal Law § 275.03, which for a second felony offender such as Johnson carries a maximum sentence of fifteen years.  Penal Law § 20.06(6)(b).  Johnson's sentence of thirteen years was less than the maximum of fifteen years.

[37/]   Under New York law, the sentencing judge is required to receive a pre-sentence report from the probation department before any felony sentencing, CPL § 390.20, and in addition, may receive an optional "written memorandum setting forth any information [the defendant or prosecutor] may deem pertinent to the question of sentence," CPL § 390.40(1), including the information described for the official report, <u>i.e.</u>:

information with respect to the circumstances attending the commission of the offense, the defendant's history of delinquency or criminality, and the defendant's social history, employment history, family situation, economic status, education, and personal habits.  Such investigation may also include any other matter which the
(continued...)

extensively upon the words of unnamed confidential sources whose reliability had never been independently tested, whom the defense had no opportunity to confront, and whose information never formed the basis of any charge" against Johnson.  (Dkt. No. 12: Ex. B: Johnson 1st Dep't Br. at 57-58.)   On direct appeal, the First Department summarily denied this claim, holding that Johnson's "claims relating to his sentence are without merit."   (See page 20 above.)

It is well established that "'[h]earsay information may unquestionably be used in the discretion of a sentencing judge and given such weight as appears in his discretion to be merited. Such information does not violate due process requirements.'"  Hili v. Sciarrotta, 140 F.3d 210, 215 (2d Cir. 1998); see, e.g., Williams v. New York, 337 U.S. 241, 250-51, 69 S.Ct. 1079, 1084-85 (1949) (The sentencing courts' "age-old practice of seeking information from out-of-court sources to guide their judgment toward a more enlightened and just sentence," including consideration of pre-sentence reports from the probation department that contain information not provided at trial, does not violate due process.); United States v. Campbell, 309 Fed. Appx. 490, 490-91 (2d Cir. 2009) ("[T]he court had 'wide latitude' to introduce 'all matters bearing upon [defendant's] personal history and behavior,' and was not 'confined to [defendant's] conduct in connection with' his offense."); Marone v. Greene Cnty. Prob. Dep't, No. 08-CV-658, 2008 WL 4693196 at *4 (N.D.N.Y. Oct. 22, 2008) ("'Thus, the mere presence of hearsay or inaccurate information in a PSR [pre-

---

37/     (...continued)
              agency conducting the investigation deems relevant to the question of sentence . . . .

       CPL § 390.30(1).

sentence report] does not constitute a denial of due process.'") (quoting <u>Hill</u> v. <u>Sciarrotta</u>); <u>Smith</u> v. <u>City of New York</u>, 05 Civ. 10465, 2006 WL 3635317 at *4 (S.D.N.Y. Dec. 12, 2006); <u>Simmons</u> v. <u>Fisher</u>, 02 Civ. 4811, 2006 WL 2129770 at *19-20 (S.D.N.Y. July 26, 2006) ("The law is well-settled that a sentencing judge may rely on a broad array of information and has substantial discretion in assessing it."); <u>Grant</u> v. <u>Ahearn</u>, No. 03CV0539, 2005 WL 1936175 at *3 (N.D.N.Y. Aug. 25, 2005) ("New York state courts have explicitly recognized that the scope of presentence reports includes information about offenses for which a defendant has not been convicted.").

Although Justice Grella sentenced Johnson without further elaboration as to what weight he gave the prosecution's pre-sentence memorandum, it was well within his discretion to consider the hearsay evidence and ascribe it the weight he felt it merited.  In any event, the First Department's denial of this claim is not contrary to or an unreasonable application of Supreme Court precedent.

Accordingly, Johnson's sentencing habeas claim should be <u>DENIED</u>.

## **CONCLUSION**

For the reasons set forth above, Johnson's habeas petition should be <u>DENIED</u> in its entirety, and a certificate of appealability should not be issued.

## **FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION**

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written

H:\OPIN\JOHNSON-Mark

objections.  See also Fed. R. Civ. P. 6.[38/]  Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Paul A. Crotty, 500 Pearl Street, Room 735, and to my chambers, 500 Pearl Street, Room 1370.  Any requests for an extension of time for filing objections must be directed to Judge Sullivan (with a courtesy copy to my chambers).  Failure to file objections will result in a waiver of those objections for purposes of appeal.  Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466 (1985); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993), cert. denied, 513 U.S. 822, 115 S. Ct. 86 (1994); Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir.), cert. denied, 506 U.S. 1038, 113 S. Ct. 825 (1992); Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989); Wesolek v. Canadair Ltd., 838 F.2d 55, 57-59 (2d Cir. 1988);

---

[38/]     If the pro se petitioner requires copies of any of the cases reported only in Westlaw, petitioner should request copies from defense counsel.  See Lebron v. Sanders, 557 F.3d 76, 79 (2d Cir. 2009); SDNY-EDNY Local Civil Rule 7.1(c)

McCarthy v. Manson, 714 F.2d 234, 237-38 (2d Cir. 1983); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P.

72.

Dated:      New York, New York
            August 26, 2010

                                    Respectfully submitted,


                                    _____
                                    **Andrew J. Peck**
                                    United States Magistrate Judge


Copies to:   Mark Johnson
             Paul M. Tarr, Esq.
             Judge Paul A. Crotty